## IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

| | |
|---|---|
| | **Case No. 3:21-cv-00590** |
| | **Case No. 3:21-cv-00593** |
| | **Case No. 3:21-cv-00594** |
| **JOHN DOES #1–9,** | **Case No. 3:21-cv-00595** |
| **Plaintiffs,** | **Case No. 3:21-cv-00596** |
| *vs*. | **Case No. 3:21-cv-00597** |
| **WILLIAM B. LEE,** *et al.*, | **Case No. 3:21-cv-00598** |
| **Defendants.** | **Case No. 3:21-cv-00624** |
| | **Case No. 3:21-cv-00671** |
| | **Judge Trauger** |

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

This Court has granted summary judgment in three prior cases holding that the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act of 2004, Tenn. Code Ann. §§ 40-39-201–40-39-218 (West 2022) (the "Act"), is punitive in effect and violates the Ex Post Facto Clause[1] as applied to offenders whose offenses occurred before its effective date. *Reid v. Lee* ["*Reid II*"], No. 3:20-CV-00050, 2022 WL 1050645, at *19 (M.D. Tenn. Apr. 7, 2022) (Trauger, J.); *Jordan v. Lee*, No. 3:19-CV-00907, 2022 WL 1196980, at *19 (M.D. Tenn. Apr. 21, 2022) (Trauger, J.); *Doe #1 v. Lee*, 518 F. Supp. 3d 1157, 1204 (M.D. Tenn. 2021) (Richardson, J.). The undisputed material facts require the same conclusion in this case. Those

---

[1] Article I, section 10, clause 1 of the United States Constitution provides that "[n]o State shall…pass any…*ex post facto* Law" (the "Ex Post Facto Clause").

facts show that the Act is punitive in effect and applies to Plaintiffs based solely on sex offenses that occurred before its 2004 effective date. Plaintiffs are therefore entitled to judgment as a matter of law that the Act violates the Ex Post Facto Clause as applied to them.[2]

## FACTS

Tennessee's first sex offender registration law became effective on January 1, 1995.[3] The Act became effective on August 1, 2004.[4] Plaintiffs are registered sex offenders whose offenses occurred before January 1, 1995.[5] The Act applies to each Plaintiff based solely on these offenses.[6] The Act classifies each Plaintiff as a "violent sexual offender."[7] The Act also classifies Doe #5 and Doe #7 as an "offender against children."[8]

A sex offender's classification and obligations as a "sexual offender," "violent sexual offender," or "offender against children" under the Act are based solely on the sex offenses for which

---

[2] Plaintiffs' complaints allege two counts that differ only in the scope of relief requested. Count 1 seeks a declaration that the Act "violates the Ex Post Facto Clause as applied based on criminal offenses that occurred before [the Act's] effective date" and an injunction prohibiting Defendants "from applying the Act based on criminal offenses that occurred before [the Act's] effective date…." *See, e.g.,* Doc. 1 at 18. In contrast, Count 2 seeks a declaration the Act "violates the Ex Post Facto Clause as applied to Plaintiff" and an injunction prohibiting Defendants "from enforcing [the Act] against Plaintiff…." *Id.* at 19. Relief on Count 1 would "reach beyond the particular circumstances of these plaintiffs" and have to "satisfy [the Supreme Court's] standards for a facial challenge to the extent of that reach." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). Relief on Count 2 would not, because it would be limited to these Plaintiffs. Given the heavier burden under Count 1, Plaintiffs move for summary judgment on Count 2 or, in the alternative, Count 1. If the Court grants relief on Count 2, Count 1 will be moot.

[3] 1994 Tenn. Pub. Acts, ch. 976, § 11.

[4] 2004 Tenn. Pub. Acts, ch. 921, § 6.

[5] Doc. 37-1 at 1–2, Doc. 37-2 at 1–2, Doc. 37-3 at 1–2, Doc. 37-4 at 1–2, Doc. 37-5 at 1–2, Doc. 37-6 at 1–2, Doc. 37-7 at 1–2, Doc. 37-8 at 1–2, Doc. 47-1 at 1–2.

[6] *Id.*

[7] *Id.*

[8] Doc. 37-5 at 14, Doc. 37-7 at 2.

the offender was convicted and the age of the victim of that offense.[9] A sex offender's classification and obligations under the Act are not based on or affected by an individualized assessment of the offender's risk of committing sex offenses.[10] A sex offender's classification and obligations under the Act as a "violent sexual offender" or an "offender against children" are not based on or affected by the age of the offense or the offender or a psychological assessment of the offender.[11]

The Tennessee Bureau of Investigation ("TBI") has recommended law enforcement officers use range finders or property assessor records to determine a sex offender's distance from restricted areas under the Act.[12] The Tennessee Sex Offender Registry web site does not provide a map showing the property line of any public school, private or parochial school, licensed day care center, other child care facility, public park, playground, recreation center, or public athletic field available for use by the general public in Tennessee or the showing the 1,000 foot boundary from those property lines.[13] The TBI maintains a drug free zone map, but this map is not intended to be relied upon by sex offender, sex offenders have no right to rely upon the accuracy of the map, and the Tennessee Sex Offender Registry web site does not refer offenders to it.[14]

Defendants admit they do not monitor or track data regarding recidivism by registrants or impact of registration on recidivism.[15] Defendants admit they have no evidence showing that the Act generally reduces the incidence of criminal offenses, reduces the likelihood of Plaintiffs committing future criminal offenses, or provides any other societal benefits, other than statements of

---

[9] As memorialized in an email exchange between counsel dated September 16, 2022, Defendants have agreed that these facts are undisputed for purposes of summary judgment.
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

law enforcement, including the declarations of Paul Grady (Doc. 55-3) and Henrietta Kerley (Doc. 55-4).[16] Defendants admit they have no evidence showing that the legislature considered any evidence in enacting any aspect of the Act and no justification for administering the Act other than its text.[17]

## ARGUMENT

The Ex Post Facto Clause prohibits laws that impose retroactive punishment. *See Weaver v. Graham*, 450 U.S. 24, 28 (1981) ("The ex post facto prohibition forbids the Congress and the States to enact any law which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.") (internal quotation marks omitted). A law imposes punishment if it is punitive in intent or punitive in effect. *See Smith v. Doe*, 538 U.S. 84, 92 (2003). To determine whether a law is punitive in effect, a court examines the statutory scheme "by reference to a variety of factors [commonly referred to as the *Mendoza-Martinez* factors] considered in relation to the statute on its face…." *Seling v. Young*, 531 U.S. 250, 262 (2001) (internal quotation marks omitted).

In *Does #1-5 v. Snyder*, 834 F.3d 696, 705 (6th Cir. 2016), the Sixth Circuit held Michigan's sex offender registry law was punitive in effect because its restrictions and requirements resembled the traditional punishments of banishment, public shaming, parole, and probation; imposed affirmative disabilities and restraints on offenders; promoted the punitive goals of incapacitation, deterrence, and retribution; and imposed burdens excessive to its non-punitive purpose of preventing future acts of sexual violence. Applying *Snyder*, this Court has granted summary judgment in three prior cases holding that the Act is substantially similar to the Michigan sex offender

---

[16] *Id.*
[17] *Id.*

registry law analyzed in *Snyder* and punitive in effect for the same reasons. *Reid II*, 2022 WL 1050645, at \*19; *Jordan*, 2022 WL 1196980, at \*19; *Doe #1,* 518 F. Supp. 3d at 1204.

Plaintiffs move the Court to grant summary judgment for the same reasons it granted summary judgment in *Reid II* and *Jordan.* On a motion for summary judgment, the Court must "view the evidence and draw all reasonable inferences in favor of the non-moving party" and grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *France v. Lucas*, 836 F.3d 612, 624 (6th Cir. 2016) (internal quotation marks and citations omitted). As in *Reid II* and *Jordan*, the undisputed material facts in this case show that the Act is punitive in effect under *Snyder* and applies to Plaintiffs based solely on sex offenses that occurred before the Act's 2004 effective date and the 1995 effective date of Tennessee's first sex offender registry law. Plaintiffs are therefore entitled to judgment as a matter of law that the Act violates the Ex Post Facto Clause as applied to them.

## I.  The Act imposes retroactive punishment in violation of the Ex Post Facto Clause.

There is no dispute that the Act applies to offenses committed before its effective date and applies to Plaintiffs based solely on offenses committed years before its 2004 effective date and before the 1995 effective date of Tennessee's first sex offender registry law. Thus, the only remaining question is whether the Act is punitive in effect under *Snyder*, 834 F.3d at 705. As this Court held in *Reid II,* 2022 WL 1050645, at \*19 and *Jordan*, 2022 WL 1196980, at \*19, it is.

### A.  The Act's punitive character must be determined on the face of the statute.

The Supreme Court applies a two-step analysis to determine whether a statute imposes punishment for purposes of the Ex Post Facto Clause:

> We must ascertain whether the legislature meant the statute to establish civil proceedings. If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil.

*Smith*, 538 U.S. at 92 (internal citations, quotation marks, and brackets omitted). Thus, a statute imposes punishment if it is punitive in intent or, despite being civil in intent, is nevertheless punitive "in purpose or effect."

To determine whether a statute intended to be civil is punitive in effect, a court does not consider "the effect that Act has on a single individual." *Seling*, 531 U.S. at 262. Rather, "courts must evaluate the question by reference to a variety of factors considered in relation to the statute **on its face**…." *Id.* (internal quotation marks omitted; emphasis added).[18] Those factors, commonly referred to as the *Mendoza-Martinez* factors, include:

> whether, in its necessary operation, the regulatory scheme: [1] has been regarded in our history and traditions as a punishment; [2] imposes an affirmative disability or restraint; [3] promotes the traditional aims of punishment; [4] has a rational connection to a nonpunitive purpose; or [5] is excessive with respect to this purpose.

*Smith*, 538 U.S. at 97 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–169 (1963)). These factors focus "on the nature of the enactment itself, not the circumstances of the individual plaintiff. There is, for example, nothing offender-specific about whether something has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, or whether the behavior to which it applies is already a crime. … As the *Mendoza-Martinez* factors plainly account for, some legal consequences, in light of their nature, context, and social function, simply

---

[18] Given the rule in *Seling*, an Ex Post Facto challenge has characteristics of both "facial" and "as-applied" challenges. It is "as-applied" because it does not attack the statute in all applications, just its application to pre-enactment offenses. It is "facial" because the determination that a statute is punitive is made on its "face" and thus is not limited to the plaintiff's particular case. *Cf. John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) ("The parties disagree about whether Count I is properly viewed as a facial or as-applied challenge. It obviously has characteristics of both: The claim is 'as applied' in the sense that it does not seek to strike the [statute] in all its applications, but only to the extent it covers referendum petitions. The claim is 'facial' in that it is not limited to plaintiffs' particular case, but challenges application of the law more broadly to all referendum petitions.") (internal citations omitted); *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 691–692 (6th Cir. 2015) ("[A] claim can have characteristics of as-applied and facial challenges[.]").

*are punishments*, regardless of any variation in the individual's subjective experience of that consequence." *Doe v. Lee*, No. 3:21-CV-00028, 2021 WL 1907813, at *13 (M.D. Tenn. May 12, 2021) (Trauger, J.) (emphasis in original).

> **B.** **The Act is punitive in effect under the Sixth Circuit's analysis in *Snyder*.**

For purposes of this motion, Plaintiff assumes the Act is civil in intent. Whether the Act is punitive in effect is determined using the *Mendoza-Martinez* factors as applied by the Sixth Circuit in *Snyder. Reid II,* 2022 WL 1050645, at *16 and *Jordan*, 2022 WL 1196980, at *16. Using *Snyder*'s analytical framework, this Court has held that the Act is punitive in effect: "*Snyder* overwhelmingly supports a holding that the Act is punitive for Ex Post Facto Clause purposes, even in the absence of a more comprehensive factual record." *Reid II,* 2022 WL 1050645, at *19; *Jordan*, 2022 WL 1196980, at *19. As this Court held in *Doe v. Lee*: "Virtually every observation that the Sixth Circuit made about the Michigan regime could be made about the Act with, at most, minimal tweaking. In terms of the multi-factor test, the Act, like Michigan's law, imposes a system that, in many ways, is simply a modern hybrid of the traditional punishments of banishment, shaming, and probation or parole. It places significant restrictions on a registrant's physical freedom in the world, including by restricting where he can live or work and whether he can enter his children's schools. Its consequences are harsh, and there exist significant questions about whether any purpose beyond retribution and punishment could justify those consequences." 2021 WL 1907813 at *13.

> **1.** **The Act resembles banishment, public shaming, parole, and probation and imposes affirmative disabilities and restraints.**

The first and second *Mendoza-Martinez* factors are whether the statutory scheme "has been regarded in our history and traditions as a punishment" and whether it "imposes an affirmative disability or restraint[.]" *Smith*, 538 U.S. at 97. Regarding the first factor, *Snyder* held the Michigan

sex offender registry law met "the general definition of punishment, has much in common with banishment and public shaming, and has a number of similarities to parole/probation" because it restricted where offenders may live, work, or be present, stigmatized them as dangerous without individualized assessment, required them to report in person, and imposed criminal penalties for failure to comply. 834 F.3d at 702–703. Regarding the second factor, *Snyder* held those geographic restrictions and reporting requirements constituted "direct restraints on personal conduct." *Id*. at 703.

***Traditional Definition of Punishment.*** There is no reasonable dispute that the Act's restrictions and requirements meet the traditional definition of punishment of obligations that "(1) involve[ ] pain or other consequences typically considered unpleasant; (2) follow[ ] from an offense against legal rules; (3) appl[y] to the actual (or supposed) offender; (4) [are] intentionally administered by people other than the offender; and (5) [are] imposed and administered by an authority constituted by a legal system against which the offense was committed." *Doe #1,* 518 F. Supp. 3d at 1184 (quoting *Snyder,* 834 F.3d at 701).

***Banishment.*** There "is no meaningful way in which the Act is less like a traditional punishment than the Michigan law was." *Reid II,* 2022 WL 1050645, at *16. Like the Michigan sex offender registry law, the Act resembles exile and banishment because it restricts where offenders may live, work, or be present. Tenn. Code Ann. § 40-39-211(a) & (d) (West 2021); *see Reid II,* 2022 WL 1050645, at *17 ("*Snyder*'s comparison to the traditional punishment of exile also holds true in Tennessee."). The Act prohibits offenders from residing or working within 1,000 feet from the property line of any public school, private or parochial school, licensed day care center, other child care facility, public park, playground, recreation center or public athletic field available for use by the general public, and prohibits offenders from standing, sitting "idly," or remaining within

that same distance of those locations if an offender "has reason to believe" minors are present and does not have a "reason or relationship involving custody of or responsibility for" a minor or "any other specific or legitimate reason for being there." Tenn. Code Ann. § 40-39-211(a) & (d) (West 2021).

As this Court held in *Reid v. Lee* [*"Reid I"*], 476 F. Supp. 3d 684 (M.D. Tenn. 2020), without knowing the "the full number of parks, schools, child care facilities, and recreation areas in Nashville, the court can take judicial notice of what anyone else in the city can see: that those locations are numerous and spread throughout at least much of the city" and that "many jobs require an individual to spend at least some amount of time in or near those facilities." *Id.* at 707; *see Reid II*, 2022 WL 1050645, at *18 ("Even without [detailed maps], the court can conclude that the Act's geographic restrictions are sufficiently severe that inclusion of the registry is at least sufficiently comparable to banishment to weigh in favor of a finding that the Act is punitive in Tennessee, just as was the case in Michigan."). Courts may take judicial notice of maps and distances between locations, *see Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1008 (6th Cir. 2017), and of "public records and government documents available from reliable sources on the Internet," *Ryan v. Tennessee Valley Auth.*, No. 3:14-CV-356-TAV-HBG, 2015 WL 1962173, at *3 n.3 (E.D. Tenn. Apr. 30, 2015) (internal quotation marks and citation omitted). The Court may take judicial notice of the maps introduced into evidence in *Doe #1 v. Lee*, 518 F. Supp. 3d at 1185–1186, and Judge Richardson's finding, based on those maps, that "the Court can clearly see that a large portion of Davidson County is unavailable to Plaintiffs and other registered sex offenders," *id.* The *Doe #1* maps depict property lines and distances from those lines. *See* 3:16-cv-02862, Doc. 70-10, Roy Dale Expert Report, at pp. 1–2 (under seal). Those facts are ascertainable from

public records, *see, e.g.,* <https://maps.nashville.gov/ParcelViewer/> (last accessed October 7, 2022), and are not subject to reasonable dispute.

While some Plaintiffs do not live in Nashville, what matters under *Seling*'s facial standard for determining punitive effect is that the Act prohibits them and every other offender from living, working, or being present in vast portions of that city. *See Doe #11 v. Lee*, No. 3:22-CV-00338, 2022 WL 2181800, at *19 (M.D. Tenn. June 16, 2022) ("It may be that an analysis of Davidson County is pertinent because, regardless of where Plaintiff actually lives, under *Seling*'s facial standard the relevant question is whether Registrants are banished from large urban areas in Tennessee (even if the particular plaintiff before the Court does not live in those places).") The fact that the Act bars offenders from much of Nashville can be extrapolated to every other urban area in Tennessee. That leads to the conclusion that the Act prohibits offenders from living, working, or being present in vast swathes of **every** populated area in the state of Tennessee.[19] *See Reid II*, 2022 WL 1050645, at *18 ("Ultimately, whether one knows every inch of the cartography or not, there is simply no serious or plausible basis for denying that, in Tennessee's denser cities, schools, parks, and daycares are geographically commonplace and difficult to avoid.").

The Court may confirm that conclusion by taking judicial notice of the TBI's Drug Free School Zone Map, available at <https://tbidrugfreezones.tbi.tn.gov/tbi_drugfreezones/> (last accessed October 7, 2022), showing the 500-foot zone around each "public or private elementary school, middle school, secondary school, preschool, child care agency, public library, recreational center, or park" in the state of Tennessee. *See* Tenn. Code Ann. § 39-17-432(b)(1)(B) and examples

---

[19] The Court may also take judicial notice of the fact that two-thirds of Tennesseans live in urban areas. *See* "2020 to 2070 Tennessee Population Projections," University of Tennessee—Knoxville, Boyd Center for Business & Economic Research, available at <https://experience.arcgis.com/experience/511cc776d42545afb2d3684ff90c2e8e> (last accessed October 7, 2022).

attached as Exhibits A, B, and C. These 500-foot zones demonstrate the Act's scope statewide even though they are 50% the size of the Act's geographical restrictions.

*Shaming.* The Act also resembles public shaming because it stigmatizes Plaintiffs and other offenders as "violent" without individualized assessment. Tenn. Code Ann. § 40-39-202(9) (2021). *Snyder* held that Michigan's sex offender registry law resembled "traditional shaming punishments" in part because it publicly classified some registrants as more dangerous than others based solely on their past offenses without any "individualized assessment" of their current dangerousness. 834 F.3d. at 702. Michigan's law classified registrants as "Tier I," "Tier II," and "Tier III" offenders based on the nature and number of their offenses, Tier III reflecting the most serious offenses. *See* Mich. Comp. Laws Ann. § 28.722(r)–(v), § 28.725a(3) (2016). A "Tier III" offender was thus publicly labeled as more dangerous than other offenders and subjected to additional "ignominy." 834 F.3d. at 703.

Michigan's "Tier" classifications are anodyne compared to the Act's classification of some offenders as "violent sexual offenders" or "offenders against children," terms that express present danger and risk. As this Court held in *Reid I*, "The court can also take judicial notice of the fact that the phrase 'violent sexual offender,' when affixed to a person without explanation carries with it a significant stigma." 476 F. Supp. 3d at 707; *see, also, Doe #1*, 518 F. Supp. 3d at 1192 (holding that the Act, by labeling plaintiff "violent sexual offender," added ignominy "beyond the ignominy otherwise resulting from his convictions, considering the not-necessarily-violent nature of the offenses that landed him in this classification"). Likewise, the label "offender against children" "conveys ignominy additional to the ignominy associated with the minimum conduct suggested either by the fact that [Plaintiff] is a registrant, the fact that he committed the particular crime that made him a registrant, or the fact that he had one (and only one) child victim." *Id.* at 1194.

***Probation and Parole.*** Finally, the Act resembles probation and parole because of its in-person reporting requirements, Tenn. Code Ann. § 40-39-204(b)(1) (2021), its extensive restrictions on where offenders may live, work, or be present, *id.* § 40-39-211(a) & (d), and its severe criminal penalties for failure to comply, *id.* § 40-39-208. *See Reid II,* 2022 WL 1050645, at *18 ("[A]lthough the Governor and Director list a number of ways in which, they argue, the Act's regime is less demanding than traditional parole, they have not explained why any of those differences distinguishes this case from *Snyder*, which explicitly did not require the conditions of inclusion on the registry to be identical to the conditions of parole in order for there to be a constitutionally persuasive resemblance.").

***Affirmative Disability or Restraint.*** There is no reasonable dispute that the Act imposes an affirmative disability or restraint. An offender "faces serious punishment, including imprisonment, if he fails to comply with in-person reporting requirements and particular geographic restrictions. These requirements and restrictions resemble probation, and probation is a restriction on liberty." *Doe #11*, 2022 WL 2181800, at *20 (quoting *Doe #1*, 518 F. Supp. 3d at 1197) (internal quotation marks, citations, and brackets omitted).

Thus, the first and second *Mendoza-Martinez* factors support the conclusion that the Act is punitive in effect.

### 2. The Act seeks to incapacitate and deter offenders and imposes retribution for past acts.

The third *Mendoza-Martinez* factor is whether the statutory scheme "promotes the traditional aims of punishment[.]" *Smith*, 538 U.S. at 97. *Snyder* held that Michigan's law advanced the three traditional aims of punishment: incapacitation, retribution, and deterrence. 834 F.3d at 704. The law incapacitated offenders by keeping them away from opportunities to reoffend, the

law was retributive because it applied to them based solely on past acts, and one of the law's express purposes was to deter recidivism. *Id.*

The "Sixth Circuit's conclusion that the Michigan scheme 'advance[d] all the traditional aims of punishment: incapacitation, retribution, and specific and general deterrence' can simply be imported, effectively word-for-word, into an analysis of Tennessee's Act." *Reid II,* 2022 WL 1050645, at *18 (quoting *Snyder*, 834 F.3d at 704). First, the Act's restrictions on where offenders may live, work, or be present incapacitate them. Second, the Act is retributive because it applies based solely on offenders' prior convictions. Third, one of the Act's express purposes is to deter recidivism. Tenn. Code Ann. § 40-39-201(b)(1) (West 2021). Thus, the third *Mendoza-Martinez* factor supports the conclusion that the Act is punitive in effect.

### 3. There is no evidence the Act prevents future acts of sexual violence.

The fourth and fifth *Mendoza-Martinez* factors are whether the statutory scheme "has a rational connection to a nonpunitive purpose" and whether it "is excessive with respect to this purpose[.]" *Smith*, 538 U.S. at 97. *Snyder* held that Michigan's law bore only a tenuous connection to its non-punitive purpose of preventing future acts of sexual violence. 834 F.3d at 704–705. *Snyder* noted "recent empirical evidence" had cast "significant doubt" on the claim that "risk of recidivism risk posed by sex offenders is frightening and high," including a study suggesting that "sex offenders (a category that includes a great diversity of criminals, not just pedophiles) are actually *less* likely to recidivate than other sorts of criminals." *Id.* at 704. *Snyder* pointed to another study concluding that sex offender registry laws "actually *increase* the risk of recidivism, probably because they exacerbate risk factors for recidivism by making it hard for registrants to get and keep a job, find housing, and reintegrate into their communities." *Id.* at 704–705. *Snyder* also noted the lack of empirical evidence "that residential restrictions have any beneficial effect on recidivism rates." *Id.* at 705. Finally, *Snyder* noted that Michigan's law made "no provision for individualized

assessments of proclivities or dangerousness." *Id. Snyder* held the burdens imposed by the Michigan sex offender registry law were excessive in relation to its purpose because there was no evidence that the "difficulties the statute imposes on registrants" are counterbalanced by any positive effects." *Id.*

For purposes of this motion, Plaintiffs assume the Act has a non-punitive purpose of preventing future acts of sexual violence. To further that purpose, the Act imposes heavy burdens on offenders by restricting where they can live, work, or be present[20] and requiring them to report in person multiple times per year. Yet there is no evidence these heavy burdens prevent sexual violence. In at least two cases, these same Defendants conceded, "at least for the purposes of summary judgment, that they do not actually have any evidence that the restrictions imposed on individuals like [the plaintiff] make crimes, let alone crimes against children, less likely." 2022 WL 1050645, at *18; *Jordan v. Lee*, No. 3:19-CV-00907, 2022 WL 1196980, at *18 (M.D. Tenn. Apr. 21, 2022). Defendants make the same concession in this case. Defendants admit they do not monitor or track data regarding recidivism by registrants or impact of registration on recidivism; have no empirical evidence that the Act generally reduces the incidence of criminal offenses, reduces the likelihood of Plaintiffs committing future criminal offenses, or provides any other societal benefits; have no evidence that the legislature considered any evidence in enacting any aspect of the Act; and have

---

[20] The Act's geographical restrictions are burdensome both in their scope and because offenders cannot readily determine their boundaries. As Defendants admit, the TBI recommends law enforcement officers use range finders or property assessor records to determine a sex offender's distance from restricted areas under the Act; the TBI does not provide a map showing the property lines of restricted areas under the Act or the 1,000 foot boundary from those property lines; and the TBI's drug free zone map is not intended to be relied upon by sex offenders, sex offenders have no right to rely upon its accuracy, and the Tennessee Sex Offender Registry web site does not refer offenders to it. *See* notes 12–14 *supra.* Thus, Defendants provide no official means by which an offender can determine where he live, work, or be present. He must determine those boundaries based on his own research and calculations and risks prosecution if he makes a mistake.

no justification for administering the Act other than its text—and the opinions of law enforcement officers charged with enforcing the Act.[21]

Those officers' opinions have little, if any, evidentiary weight. One officer says the registry is beneficial because members of the public can use it to decide where to live or work and landlords can use it to screen tenants. Doc. 55-3 at ¶¶ 5, 6. This officer says without further detail that he knows of "multiple offenders who have reoffended with additional sex crimes while on the sex offender this registry." *Id.* at ¶ 8. This vague, anecdotal evidence proves, at best, that some sex offenders reoffend and, at worst, that being on the sex offender registry does **not** prevent them from re-offending. The other officer says the registry is beneficial because it "raises public aware-ness to sexual crimes and convicted offenders within their communities. Doc. 55-4 at ¶ 8. This officer "absolutely believe[s] there is a reduction in crime because sex offenders are required to register" because she "believe[s] some offenders are opportunist." *Id.* at ¶ 7. This officer's unsub-stantiated belief does not prove the Act's burdens on offenders have caused or are likely to cause a decrease in recidivism or are not excessive in relation to any decrease it might cause.

Nor is there evidence that all offenders pose the same risk of committing sexual violence, and it defies reason to think they would. To the contrary, it is reasonable to expect a person's risk of committing sexual violence to vary depending on factors like the nature of offense, the passage of time, subsequent offenses, and evidence of rehabilitation. Yet the Act takes none of this into account, imposing the same heavy burden on the twenty-year old rapist convicted last year and the octogenarian convicted of sexual battery forty years ago. Thus, even if it could be shown that the Act *might* prevent sexual violence by *some* offenders, the Act's burdens are excessive in relation to that purpose. In order for the Act "to qualify as a prophylactic, civil safety regime, there needs

---

[21] *See* notes 9–11, 15–17 *supra.*

to be at least some tailoring of its restrictions to actual, demonstrable risks. Instead, the Act simply imposes its restrictions automatically on every person convicted by a jury of committing a certain type of criminal offense—in other words, like a punishment." *Reid II*, 2022 WL 1050645, at *18. The fourth and fifth *Mendoza-Martinez* factors therefore support the conclusion that the Act is punitive in effect.

* * *

*Snyder* held that Michigan's law was punitive in effect because it "brands registrants as moral lepers solely on the basis of a prior conviction," "consigns them to years, if not a lifetime, of existence on the margins," and "directly regulates where registrants may go in their daily lives…." 834 F.3d at 705. The Act likewise subjects offenders like Plaintiffs to severe burdens based solely on their prior convictions, restricting where they can live, work, or be present, mandating when and where they must report, and interfering extensively into their relationships with their children. Under *Snyder*'s analysis, the Act is punitive in effect on its face and violates the Ex Post Facto Clause as applied to Plaintiffs.

## II. Elision cannot cure the Act's Ex Post Facto violation.

In support of their own summary judgment motion, Defendants argue that the Court can cure any Ex Post Facto violation by severing the Act's geographical restrictions and upholding its registration and reporting requirements. Doc. 116 at 23, 25. Defendants are mistaken. Elision is not proper in this case because it would amount to rewriting the Act, which the doctrine of elision does not permit.

Whether unconstitutional statutory provisions may be elided is a question of state law. *Leavitt v. Jane L.,* 518 U.S. 137, 139 (1996). Under Tennessee law, the "doctrine of elision is not favored," *Gibson Cty. Special Sch. Dist. v. Palmer*, 691 S.W.2d 544, 551 (Tenn. 1985), and there is "a presumption against sustaining the remaining part of a statute where a part of the statute is

held unconstitutional," *Vollmer v. City of Memphis*, 730 S.W.2d 619, 622 (Tenn. 1987). Elision is permissible only if it appears "from the face of the statute that the legislature would have enacted it with the objectionable features omitted…." *Gibson*, 691 S.W.2d at 551. (citations, internal quotation marks, and ellipses omitted). This conclusion "ought not to be reached unless such conclusion is made fairly clear of doubt from the face of the statute. Otherwise, its decree may be judicial legislation." *Id.* (citations and internal quotation marks omitted).

A severability clause may "evidence an intent on the part of the legislature to have the valid parts of the statute in force if some other portion of the statute has been declared unconstitutional," *id.,* but the doctrine of elision "is not a proper means to completely re-write or make-over a statute," *State v. Crank*, 468 S.W.3d 15, 29 (Tenn. 2015) (internal citation and quotation marks omitted). Where "a clause is so interwoven with other portions of an act that we cannot suppose that the legislature would have passed the act with that clause omitted, then if such clause is declared void, it renders the whole act null." *State v. Tester*, 879 S.W.2d 823, 830 (Tenn. 1994) (internal citation and quotation marks omitted). The same is true of Tennessee's general severability statute, Tenn. Code Ann. § Tenn. Code Ann. § 1-3-110 (West 2022): "[T]he legislature's endorsement of elision does not automatically make it applicable to every situation; however, when a conclusion can be reached that the legislature would have enacted the act in question with the unconstitutional portion omitted, then elision of the unconstitutional portion is appropriate." *Willeford v. Klepper*, 597 S.W.3d 454, 471 (Tenn. 2020).

Eliding the Act's geographical restrictions would constitute improper judicial legislation because it does not appear "from the face of the statute that the legislature would have enacted it with the objectionable features omitted…." *Gibson*, 691 S.W.2d at 551. (citations, internal quotation marks, and ellipses omitted). Defendants argue the Act is "susceptible to elision" because they

claim its registration and reporting system and the geographic restrictions are "two separate and distinct regulatory schemes…." Doc. 116 at 25. Defendants are mistaken. The Act's geographical restrictions, along with its reporting requirements and classification scheme, were original components of its statutory scheme. Furthermore, the geographical restrictions are, as a practical matter, inextricably "interwoven" with the rest of the Act's registration scheme. Removing those provisions would be the equivalent of removing vital organs. *See Doe v. Snyder*, 449 F. Supp. 3d 719, 733 (E.D. Mich. 2020) ("Without the key definitions and provisions provided by the 2011 amendments, [the Michigan sex offender registry act] in its current form is incomprehensible to registrants and enforcement officials alike. While the court may excavate and remove unconstitutional pieces of a statute, it must hesitate gravely before trying to backfill the holes left behind with newly-crafted statutory language. The burden of that manual labor falls, in almost every instance, to the legislature.").

For that reason, elision would be ineffective as a practical matter. If, for example, the Court enjoins enforcement of the geographic restrictions but Plaintiffs remain subject to registration, they will remain exposed to illegal arrest for violating those restrictions. For example, if a police officer stops one of these Plaintiffs loitering near a playground and checks his name against the sex offender registry, the registry will reveal that he is a sex offender and the officer will conclude Plaintiff is in violation of the Act. He will go through the humiliation of arrest, booking, and jail before he is able to demonstrate to the police or the prosecutor that he is not subject to that restriction. Preventing this scenario would require restructuring the registry in ways not authorized by the Act, and a court ordering such restructuring would engage in improper "judicial legislation." *Vollmer*, 730 S.W.2d at 622.

**III.    The Court should permanently enjoin Defendants to remove Plaintiffs from the SOR and otherwise cease enforcing the Act against Plaintiffs.**

The Court has already granted preliminary injunctive relief to Does #1–8. The standard for permanent injunctive relief is identical. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("[A] plaintiff seeking a permanent injunction must…demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."). For the same reasons the Court granted preliminary injunctive relief, the Court should grant permanent injunctive relief to all Plaintiffs on the same terms as its preliminary injunction.[22]

**IV.    The Court should also declare that the Act is punitive and violates the Ex Post Facto Clause as applied to Plaintiffs.**

Pursuant to 28 U.S.C. § 2201(a), Plaintiffs request the Court to declare that the Act is punitive in effect, violates the Ex Post Facto Clause as applied to Plaintiffs, and that Plaintiffs have no obligation to comply with the Act. Section 2201(a) provides in relevant part:

> In a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). Federal Rule of Procedure 57 provides in relevant part:

> These rules govern the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201. …. The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate. ….

Courts consider five non-exclusive factors when deciding whether to grant a declaratory judgment:

---

[22] *See* note 2 *supra.*

(1)     Whether the declaratory action would settle the controversy;

(2)     whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;

(3)     whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata;"

(4)     whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach upon state jurisdiction; [which is determined by asking]

     a.     whether the underlying factual issues are important to an informed resolution of the case;

     b.     whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and

     c.     whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action; and

(5)     whether there is an alternative remedy which is better or more effective.

*W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014) (quoting *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008)) (brackets in original).

These factors support granting Plaintiffs' request for declaratory relief:

**Factor 1.** This declaration would settle this case by giving Plaintiffs complete relief from compliance with the Act.

**Factor 2.** This declaration would make it clear that no government agent has the power to enforce the Act against Plaintiffs and Plaintiffs have no obligation to comply with the Act.

**Factor 3.** This factor is inapplicable.

**Factor 4.** This factor is inapplicable.

**Factor 5.** While it might be argued that the injunctive relief Plaintiffs seek is superior to declaratory relief because it would remove Plaintiffs from the SOR and prohibit Defendants and anyone acting in concert with them from enforcing the Act against Plaintiffs on pain of contempt,

this factor does not weigh against granting declaratory relief because declaratory relief would complement injunctive relief by stating in plain terms that no one may enforce the Act against Plaintiffs and Plaintiffs have no obligation to comply with the Act.

## V. The Court should award Plaintiffs as reasonable attorney fee.

Plaintiffs' complaints include a request for attorney fees pursuant to 42 U.S.C. § 1988(b): "In any action or proceeding to enforce a provision of sections…1983…the court, in its discretion, may allow the prevailing party…a reasonable attorney's fee as part of the costs…." If this Court grants Plaintiffs summary judgment, they will be prevailing parties under 42 U.S.C. § 1983 and entitled to file a motion for attorney fees pursuant to Fed. R. Civ. P. 54(d)(2) and Local Rule 54.01(b).

## CONCLUSION

For these reasons, Plaintiffs request the Court to grant summary judgment as set forth in their motion and to grant any other necessary or proper relief.

Dated: October 7, 2022.

Respectfully submitted:

/s/ W. Justin Adams
Edward M. Yarbrough (TN BPR # 004097)
Jonathan P. Farmer (TN BPR # 020749)
W. Justin Adams (TN BPR # 022433)
SPENCER FANE LLP
511 Union Street, Suite 1000
Nashville, Tennessee 37219
Telephone: 615-238-6300
eyarbrough@spencerfane.com
jfarmer@spencerfane.com
wjadams@spencerfane.com

Plaintiffs' Counsel

**CERTIFICATE OF SERVICE**

I certify that on October 7, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by email:

Courtney N. Orr, Esq.
Cody N. Brandon, Esq.
Mallory K. Schiller, Esq.
Miranda Jones, Esq.
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202-0207
robert.mitchell@ag.tn.gov
courtney.orr@ag.tn.gov
cody.brandon@ag.tn.gov
mallory.schiller@ag.tn.gov
miranda.jones@ag.tn.gov

Counsel for Defendants

/s/W. Justin Adams
W. Justin Adams