## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JOHN DOES #1–9,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:21-cv-00590** |
| | ) | **Case No. 3:21-cv-00593** |
| **WILLIAM LEE, in his capacity as** | ) | **Case No. 3:21-cv-00594** |
| **Governor of the State of Tennessee,** | ) | **Case No. 3:21-cv-00595** |
| **and DAVID RAUSCH, in his capacity as** | ) | **Case No. 3:21-cv-00596** |
| **Director of the Tennessee Bureau of** | ) | **Case No. 3:21-cv-00597** |
| **Investigation,** | ) | **Case No. 3:21-cv-00598** |
| | ) | **Case No. 3:21-cv-00624** |
| **Defendants.** | ) | **Case No. 3:21-cv-00671** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |

## MEMORANDUM

Governor William Lee and Director David Rausch of the Tennessee Bureau of Investigation ("TBI") have filed a Motion for Summary Judgment (Doc. No. 115), to which the nine John Doe plaintiffs have jointly filed a Response (Doc. No. 126), and the Governor and Director have filed a Reply (Doc. No. 129). The plaintiffs also have filed a Motion for Summary Judgment (Doc. No. 121), to which the Governor and Director have filed a Response (Doc. No. 127), and the plaintiffs have filed a Reply (Doc. No. 130). One plaintiff, Doe #9, has filed a Renewed Motion for Preliminary Injunction. (Doc. No. 102.) For the reasons set out herein, the plaintiffs' Motion for Summary Judgment will be granted, the defendants' motion will be denied, and Doe #9's motion will be denied as moot.

# I. BACKGROUND[1]

## A. The Constitutional Prohibition on *Ex Post* Facto Punishments

The United States Constitution presupposes that the government may punish people for actions that have been deemed criminal. However, the government's authority to impose criminal punishment is subject to certain special constraints that may not apply to the government's other powers. One such constraint is the Constitution's ban on the adoption of "ex post facto Laws," set out in its *Ex Post Facto* Clauses, one of which applies to the federal government and one to the states. U.S. Const., art I, §§ 9, cl.3, 10, cl. 1.[2]

"[E]x post facto law" is "a term of art" that, consistently with its "established meaning at the time of the framing," has been construed to refer to criminal, but not civil, laws that are retroactive in effect. *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995) (quoting *Collins v. Youngblood*, 497 U.S. 37, 43 (1990)). *But see Collins*, 497 U.S. at 41 (acknowledging that a literal reading of the language would reach all, not merely criminal, laws). In its most straightforward formulation, the *Ex Post Facto* Clause dictates that "[l]egislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins*, 497 U.S. at 43. "Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 U.S. 24, 28–29 (1981) (citing *Dobbert v. Florida*, 432 U.S.

---

[1] A substantial portion of this opinion reiterates background and analysis that previously appeared in the court's December 3, 2021 Memorandum explaining why the court was granting preliminary injunctive relief to Does #1 through #8. (Doc. No. 76.) The court's conclusions, however, reflect an application of the governing law to the particular evidence and arguments presented in the context of the motions for summary judgment.

[2] Because this case involves actions by the State of Tennessee, the court will refer to the state Clause, U.S. Const., art I, § 10, cl. 1, as "the *Ex Post Facto* Clause."

282, 298 (1977); *Kring v. Missouri*, 107 U.S. 221, 229 (1883); *Calder v. Bull*, 3 U.S. 386, 387 (1798)).

The *Ex Post Facto* Clause, on its face, contains no exceptions and makes no reference to the severity of either the crime committed or the punishment at issue. That is because the core interest protected by the Clause "is not an individual's right to less punishment," but rather the "lack of fair notice" given by the government. *Weaver*, 450 U.S. at 30. Accordingly, even a scrupulously proportionate punishment can violate the *Ex Post Facto* Clause if it was not authorized at the time that the underlying wrongful act was committed, and even a manifestly unjust and disproportionate punishment will not violate the Clause, as long as that punishment was authorized ahead of time. The *Ex Post Facto* Clause is concerned with timing and notice, not reasonableness in a larger sense.

While the core prohibition of the *Ex Post Facto* Clause is straightforward, courts have long struggled with its outer boundaries. For example, it is accepted as axiomatic that the Clause "forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer." *Lindsey v. Washington*, 301 U.S. 397, 401 (1937) (citing *Kring*, 107 U.S. at 228–29; *Thompson v. Utah*, 170 U.S. 343, 351 (1898); *In re Medley*, 134 U.S. 160, 171 (1890)). Accordingly, a state could not retroactively turn a crime with a ten-year minimum sentence into one with a twenty-year minimum sentence. The actual practice of criminal punishment, however, involves more than merely imposing a sentence dictated by statute. The punishment that a convicted defendant will actually receive involves an array of judicial and administrative determinations, including the selection of a sentence from a range of possible options, the calculation of actual days to serve, the availability of "good time" or other post-conviction reductions in time to serve, and, of course, the availability of parole. The

3

procedures and substantive principles governing these secondary determinants of punishment are often amended as well, raising the question of whether those changes can be applied retroactively.

Faced with these issues, the Supreme Court's "cases 'have not attempted to precisely delimit the scope of'" the term "*ex post facto* Law," "but have instead given it substance by an accretion of case law." *Peugh v. United States*, 569 U.S. 530, 538–39 (2013) (quoting *Dobbert*, 432 U.S. at 292); *see, e.g., id.* at 544 (holding that retroactive application of change in Sentencing Guidelines violated the *Ex Post Facto* Clause); *Lynce v. Mathis*, 519 U.S. 433, 446 (1997) (holding that retroactive cancellation of provisional early release credits violated the *Ex Post Facto* Clause); *Morales*, 514 U.S. at 514 (holding that retroactive application of law allowing for deferral of parole hearings did not violate the *Ex Post Facto* Clause); *Weaver*, 450 U.S. 36 (holding that retroactive application of statute reducing availability of good time credits violated the *Ex Post Facto* Clause).

## B. Tennessee's Sexual Offender Registry and Restrictions on Registrants

Prior to 1995, individuals in Tennessee convicted of sexual offenses faced formal consequences that were mostly similar to those borne by individuals convicted of similarly serious non-sexual offenses. There may have been unique collateral consequences for sexual offenses in some areas—such as in family law proceedings—and defendants convicted of sexual crimes may have suffered especially severe extralegal reputational harms in their communities. For the most part, however, the path of a person convicted of a sexual offense was a familiar one: he[3] would be convicted and serve punishment, often in the form of incarceration, after which he might be paroled or, if not paroled, released when his sentence was completed. Then, if there

---

[3] Of course, sexual offenses are committed by women as well as men.

4

were no other sentences or charges awaiting him related to other crimes, he would attempt to reintegrate into society.

In 1994, however, the Tennessee General Assembly, concerned with the potential actions of sexual offenders after they had served their sentences, adopted legislation requiring the TBI to "establish, maintain, and update a centralized record system of sexual offender registration and verification information." 1994 Tenn. Pub. Laws, ch. 976 § 7(a). That statute went into effect on January 1, 1995. (Doc. No. 128 ¶ 1.) Although the details, and even the name, of Tennessee's registration statutes have changed significantly over time, the court will refer to them generally as "the Act." The Act, in its original form, required registration for all individuals convicted of any one of a number of identified sexual offenses, "unless the offender had been wholly released without supervision from incarceration, probation, or parole prior to January 1, 1995." *Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *1 (M.D. Tenn. Nov. 9, 2017) (Crenshaw, C.J.) (citing 1994 Tenn. Pub. Laws, ch. 976 § 3(2)–(3)). Accordingly, there existed a subset of defendants who were required to register based on crimes they committed before the registry was in place: namely, (1) convicted defendants who were still in the process of incarceration, parole, or supervision for a crime committed prior to 1995; and (2) individuals who committed crimes prior to 1995 but would only go on to be convicted at a later date.

The initial registration system was relatively undemanding and mostly concerned with ensuring the accuracy of registry information. A person convicted of a covered offense was required to register with the TBI by paper form within ten days of release without supervision from probation, parole, or incarceration. 1994 Tenn. Pub. Laws, ch. 976 § 4. The TBI would then send the registrant a fresh verification form every ninety days, which the registrant was required to return within ten days of receipt. *Id.* § 5. The registrant also had an ongoing duty to complete a

new form within ten days of any change of residence. *Id.* § 4. The information in the registry was generally considered confidential, but the TBI or a local law enforcement agency could "release relevant information deemed necessary to protect the public concerning a specific sexual offender." *Id.* § 7(c). After ten years, a registrant could petition a court to order his removal from the registry, which the court would grant if it found the registrant had complied with the Act, was rehabilitated, and did not pose a threat to public safety. *Id.* § 8. There were no restrictions on where a registrant could live, work, or travel. *Doe*, 2017 WL 5187117 at *2.

In the ensuing decades, however, the Tennessee General Assembly repeatedly returned to the sexual offender registration statutes to change whom they reached, what they required, and how much protection (or lack thereof) they offered to registered offenders' privacy. Among those changes was a legislative extension of the Act's once-limited retroactive applicability. Tenn. Code Ann. §§ 40-39-202(20), (31), 40-39-203(a)(2). Chief Judge Crenshaw of this district has recounted the Act's long history of more than two dozen revisions in *Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *1 (M.D. Tenn. Nov. 9, 2017), and this court will refer to that opinion for the details. In short, Tennessee's sexual offender registration system progressed from a relatively simple system, dedicated to information gathering and tracking, into a far-reaching structure for regulating the conduct and lifestyles of registered sexual offenders after their punishments were complete and, in many cases, for the rest of their lives. The court will briefly summarize some of the key provisions in their current form.

<u>1.Initial Eligibility and Levels of Offender</u>

The current version of the Act dictates that individuals convicted of certain enumerated offenses must register with law enforcement for inclusion in a database maintained by the TBI. Offenses that require registration are mostly ones that, on their face, contain a sexual element,

such as serial indecent exposure, aggravated rape, and rape of a child.[4] Tenn. Code Ann. § 40-39-202(20)(A)(vii), (31)(A), (D).

The Act divides registrants into "sexual offenders" and "violent sexual offenders," based primarily on the particular offense of which the person was convicted.[5] Most, but not all, of the crimes designated as violent sexual offenses include an element of actual violence. *See* Tenn. Code Ann. § 40-39-202(31). A (non-violent) sexual offender with no prior conviction for a sexual offense may petition to be removed from the registry after ten years, and his petition will be considered in light of a number of factors, including his history of compliance with the Act's restrictions. A violent sexual offender or a sexual offender with a prior conviction, however, will remain on the registry for the remainder of his life. Tenn. Code Ann. § 40-39-207(g)(2).

A registered offender's Tennessee-issued driver's license will identify him as a sexual offender or violent sexual offender, as applicable. Tenn. Code Ann. § 55-50-353. He is required to carry his driver's license or equivalent government-issued photo identification card whenever outside his home. Tenn. Code Ann. § 40-39-213.

<u>2. Registration and Updating Information</u>

An offender registering for the first time must provide the following information, on penalty of perjury:

> (1) Complete name and all aliases, including, but not limited to, any names that the offender may have had or currently has by reason of marriage or otherwise, including pseudonyms and ethnic or tribal names;
>
> (2) Date and place of birth;
>
> (3) Social security number;

---

[4] It is possible, however, to qualify for registration based on the kidnapping of a child other than one's own, without any additional sexual component. Tenn. Code Ann. § 40-39-202(20)(a)(vi).

[5] A separate category exists for "violent juvenile sexual offenders," Tenn. Code Ann. § 40-39-202(28), which is not relevant to this case.

7

(4) A photocopy of a valid driver license, or if no valid driver license has been issued to the offender, a photocopy of any state or federal government issued identification card;

(5) For an offender on supervised release, the name, address and telephone number of the registrant's probation or parole officer or other person responsible for the registrant's supervision;

(6) Sexual offenses or violent sexual offenses for which the registrant has been convicted, the date of the offenses and the county and state of each conviction; or the violent juvenile sexual offense for which the registrant has been adjudicated delinquent, the date of the act for which the adjudication was made and the county and state of each adjudication;

(7) Name of any current employers and length of employment, including physical addresses and phone numbers;

(8) Current physical address and length of residence at that address, which shall include any primary or secondary residences . . . ;

(9) Mailing address, if different from physical address;

(10) Any vehicle, mobile home, trailer or manufactured home used or owned by an offender, including descriptions, vehicle information numbers and license tag numbers;

(11) Any vessel, live-aboard vessel or houseboat used by an offender, including the name of the vessel, description and all identifying numbers;

(12) Name and address of each institution of higher education in this state where the offender is employed or practices a vocation or is a student;

(13) Race and gender;

(14) Name, address and phone number of offender's closest living relative;

(15) Whether victims of the offender's convictions are minors or adults, the number of victims and the correct age of the victim or victims and of the offender at the time of the offense or offenses, if the ages are known;

(16) Verification by the TBI or the offender that the TBI has received the offender's DNA sample;

(17) A complete listing of the offender's electronic mail address information, including usernames, any social media accounts the offender uses or intends to use, instant message, other internet communication platforms or devices, and the offender's username, screen name, or other method by which the offender accesses these accounts or websites;

(18) Whether any minors reside in the primary or secondary residence;

(19)(A) Any other registration, verification and tracking information, including fingerprints and a current photograph of the offender, vehicles and vessels, as referred to in subdivisions (i)(10) and (i)(11), as may be required by rules promulgated by the TBI . . . ;

8

(20) Copies of all passports and immigration documents; and

(21) Professional licensing information that authorizes an offender to engage in an occupation or carry out a trade or business.

Tenn. Code Ann. § 40-39-203(*i*). The Act provides that much of this information, including the registrant's photograph, address and employer, "shall be considered public information" and must be made available to the public through a web page. Tenn. Code Ann. § 40-39-206(d).

The offender has an ongoing duty to keep the state's information up to date. "Within forty-eight (48) hours of establishing or changing a primary or secondary residence, establishing a physical presence at a particular location, becoming employed or practicing a vocation or becoming a student in this state, the offender shall register or report in person" with the appropriate law enforcement agency.[6] Tenn. Code Ann. § 40-39-203(a)(1). A registrant also has 48 hours to report any "change in any other information given to the registering agency by the offender that is contained on the registration form" or any "material change in employment or vocation status." Tenn. Code Ann. § 40-39-203(a)(4), (6). The registrant has "three (3) days, excluding holidays" to report any change in his "electronic mail address information, any instant message, chat or other internet communication name." Tenn. Code Ann. § 40-39-203(7).

If the registrant fails to provide any of the required updated information within the time periods required, he has committed a Class E felony. Tenn. Code Ann. § 40-39-208(b). The registrant's first such offense is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-208(c). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and

---

[6] Although the TBI administers the sexual offender registration itself, many of the ongoing activities related to registration are overseen by the registrant's "[d]esignated law enforcement agency," which is defined as "any law enforcement agency that has jurisdiction over the primary or secondary residence, place of physical presence, place of employment, school or institution of higher education where the student is enrolled or, for offenders on supervised probation or parole, the department of correction or court ordered probation officer." Tenn. Code Ann. § 40-39-202(2).

9

imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-208(d). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-208(e).

### 3. In-Person Reporting and Fees

The Act also requires periodic in-person reporting with the offender's designated law enforcement agency. Violent sexual offenders must "report in person during the months of March, June, September, and December of each calendar year, to the designated law enforcement agency, on a date established by such agency, to update the offender's fingerprints, palm prints and photograph, as determined necessary by the agency, and to verify the continued accuracy of the information in the TBI registration form." Tenn. Code Ann. § 40-39-204(b)(1). Sexual offenders must report in person once a year. Tenn. Code Ann. § 40-39-204(c). At the sexual offender's check-in, or the violent sexual offender's first check-in, he is required to pay administrative fees not to exceed $150. Tenn. Code Ann. § 40-39-204(b)(1), (c). If the offender lives in a county or municipality that has adopted a "community notification system" to inform the public when a sexual offender moves in nearby, the offender may be liable for an additional $50 fee. Tenn. Code Ann. § 40-39-217(a)(2).

### 4. Restrictions on Where a Registrant Can Live or Work

A registered offender may not

knowingly establish a primary or secondary residence or any other living accommodation or knowingly accept employment within one thousand feet (1,000') of the property line of any [1] public school, [2] private or parochial school, [3] licensed day care center, [4] other child care facility, [5] public park, [6] playground, [7] recreation center, or [8] public athletic field available for use by the general public.

10

Tenn. Code Ann. § 40-39-211(a)(1). There is an exception if the proximity exists solely because of the change in ownership of a property after the offender established the residence or began the job. Tenn. Code Ann. § 40-39-211(e). Violating this restriction is a Class E felony. Tenn. Code Ann. § 40-39-211(f). The first violation is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-211(g)(2). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-211(g)(3).

### 5. Restrictions on Registrant's Movements

A registered offender is forbidden from knowingly

> [b]e[ing] upon or remain[ing] on the premises of any building or grounds of any
> [1] public school, [2] private or parochial school, [3] licensed day care center, [4]
> other child care facility, [5] public park, [6] playground, [7] recreation center or
> [8] public athletic field available for use by the general public in this state when
> the offender has reason to believe children under eighteen (18) years of age are
> present.

Tenn. Code Ann. § 40-39-211(d)(1). There are exceptions for certain expressly enumerated parenting-related activities, but those exceptions are only available if the offender has obtained "written permission or a request from the school's principal or the facility's administrator." Tenn. Code Ann. § 40-39-211(d)(2)(B). A separate provision allows a registered offender to pick up and drop off his child if he has provided the relevant administrator with written notice— meaning that, although the administrator can deny permission for most purposes, the administrator cannot prevent the offender from transporting his child to and from the school or

11

facility, as long as the offender leaves immediately and does not otherwise come onto the premises. Tenn. Code Ann. § 40-39-211(d)(2)(D).

An offender is also forbidden from "[s]tand[ing], sit[ting] idly, whether or not the offender is in a vehicle, or remain[ing] within one thousand feet (1,000') of the property line of any" of the aforementioned facilities "when children under eighteen (18) years of age are present, while not having a reason or relationship involving custody of or responsibility for a child or any other specific or legitimate reason for being there." Tenn. Code Ann. § 40-39-211(d)(1)(B).

A violation of any of these restrictions is a Class E felony. Tenn. Code Ann. § 40-39-211(f). The first violation is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-211(g)(2). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-211(g)(3). A violation that is "due solely to a lack of the written permission required," however, is punishable only by fine. Tenn. Code Ann. § 40-39-211(g)(4).

<u>6. Additional Restrictions Related to Children</u>

A registered offender may not "be alone with a minor or minors in a private area," defined generally as "any real or personal property, regardless of ownership, where the conduct of the offender is not readily observable by anyone but the minor or minors alone with the offender." Tenn. Code Ann. § 40-39-211(k)(1)(B), (2). Exceptions exist for the offender's own child, if certain criteria are met. Tenn. Code Ann. § 40-39-211(c), (k)(2). A violation is a Class E

felony. Tenn. Code Ann. § 40-39-211(f). The first violation is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-211(g)(2). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-211(g)(3).

## C. The Plaintiffs' Claims

Each of the plaintiffs was convicted of a sexual offense or offenses that occurred prior to January 1, 1995. (Doc. No. 128 ¶ 3.) The earliest of those offenses occurred at least as long ago as 1982; the latest occurred in 1994.[7] (Doc. No. 125 ¶¶ 1, 13.) For each plaintiff, his pre-1995 behavior and the resulting conviction or convictions are the sole reason that he is required to comply with the Act. (Doc. No. ¶ 4.) Each plaintiff is classified as a "violent sexual offender." (*Id.* ¶¶ 5–6.) Some of the plaintiffs had victims who were minors, and others did not. (*Id.* ¶¶ 1–26.)

Each of the plaintiffs filed a Complaint challenging the application of the Act to him, and the court consolidated the cases for consideration together. (Doc. Nos. 17, 40.) The Complaints are largely identical, aside from mostly-irrelevant biographical details. Each Complaint purports to state two counts under 42 U.S.C. § 1983. The only difference between those counts is that Count 1 is premised on the assertion that the Act "violates the Ex Post Facto Clause and is unconstitutional as applied *based on criminal offenses that occurred before SORA's effective*

---

[7] The court notes that Doe #1's offense occurred a few months after the original, bare-bones version of the Act was signed by the then-Governor but a few months before the law went into effect. The defendants have not suggested that this plaintiff-specific quirk of timing makes any difference to the court's *Ex Post Facto* Clause analysis. The Supreme Court has been clear that the relevant date, for *Ex Post Facto* Clause purposes, is the law's "effective date." *Weaver*, 450 U.S. at 36.

13

*date*," whereas Count 2 is premised on the assertion that the Act "violates the Ex Post Facto Clause as applied to" *each individual plaintiff*. (*E.g.*, Doc. No. 1 ¶¶ 87, 92 (emphases added).) Because each plaintiff is subject to the act based solely on an offense committed before the Act's effective date, the distinction between the two counts is, as the court will explore in more detail later in this opinion, not particularly stark.

The plaintiffs filed a Joint Motion for Preliminary Injunction (Doc. No. 45), which the court granted as to Doe #1 through Doe #8. The court did not grant the motion as to Doe #9, who did not, at the time, live in Tennessee. (Doc. No. 76 at 8.) On August 8, 2022, Doe #9 filed a motion renewing his request for a preliminary injunction, accompanied by an update on his plans to move back to Tennessee. (Doc. Nos. 102, 105.) Not long thereafter, he filed a Notice confirming that the move had occurred. (Doc. No. 112.) The parties have now completed discovery and filed respective Motions for Summary Judgment.

## D. Additional Materials Relevant to the Efficacy and Purpose of the Act

Because this case has reached the summary judgment stage, the parties have now had a full opportunity to seek and present evidence regarding the Act's real-world implications. Some such materials, however, were already in the record. Earlier in the case, when the court considered the plaintiffs' entitlement to preliminary injunctive relief, the defendants filed Declarations by two members of law enforcement regarding the perceived efficacy and purpose of the Act. (Doc. Nos. 55-3, -4.) Neither Declaration, however, includes any direct empirical evidence of the Act's having prevented any sexual offense. Nor do the Declarations include meaningful evidence regarding the likelihood of recidivism by registrants, other than by acknowledging, unremarkably, that some undefined amount of recidivism does occur.

14

Rather, the Declarations focus primarily on the fact that members of the public have expressed appreciation for the informational aspects of the registry. Insofar as the other, more invasive and demanding aspects of the Act are addressed, the Declarations include little, if anything, more than pure speculation about their effectiveness. For example, Blount County Sheriff's Office investigator Paul Grady's explanation of the Act's benefits reads, in its entirety, as follows:

> 5. There are multiple benefits to requiring sex offenders to register. Many of these come from the tragic stories we have learned that shaped the registry over the last several decades into what we see today. The old saying is "knowledge is power." The public sex offender registry puts knowledge and information at the general public's fingertips that help them make informed decisions to help them stay safe ([e.g.,] Do I buy this house? Do I accept a job here?, etc.)

> 6. Tennessee's sex offender registry has helped my community. We have helped by doing workshops for school boards, churches, employers, etc. and also always meet with or field calls from our citizens to help them and inform them of their rights and the laws. As far as the SOR in general goes, it has helped our community by functioning as it was intended from the beginning as a public safety tool. When citizens utilize the registry, they can make informed decisions for their own health and welfare. In regards to illustrations, I recently spoke with a local apartment complex administrator who had questions about registered sex offenders. The information given, led to them declining to rent to an offender against children. They have many children who live in the complex. We have many such stories where the SOR has had a direct positive impact on our county.

> 7. My community is safer because of the public sex offender registry. Again, it will only be as effective as it is utilized. TBI has done a great job of building an up-to-date, real time public registry that offenders can use and access the mandated public information to their benefit.

> 8. I have multiple offenders who have reoffended with additional sex crimes while on the sex offender registry.

(Doc. No. 55-3 ¶¶ 5–8.) Similarly, Cumberland County Sheriff's Office registry compliance officer Henrietta Kerley's account of the Act's benefits reads—again, in its entirety—as follows:

> 5. There are benefits to the Tennessee sex offender registry. Officers and Investigators are aware of the offenders on the registry. When doing residential

15

checks on the offenders, officers become aware of where they live, work, or go to school. When our department takes a report, sexual in nature, having the registry available to the Investigators may give the Investigating Officer insight to the MO of the offender.

6. The sex offender registry has helped my community. The community loves having the ability to check for offenders in their neighborhoods. This office is constantly getting praise from the citizens of this county for doing their part to keep the communities safe. The SOR Office receives phone calls of people moving into our county or even changing neighborhoods within the county with questions about Sexual Offenders in the area. The SOR has been a great asset to our County and State. Community awareness to me is a great asset in keeping our citizens safe.

7. I absolutely believe there is a reduction in crime because sex offenders are required to register. I believe that some offenders are opportunist. When an offender knows they are required to register, have periodic residential verification, and laws to abide by that are enforced it narrows opportunity for the offender. Therefore I believe crime is reduced.

8. My community is definitely safer because of the public registry. The Tennessee sex offender registry not only educates the public but raises public awareness to sexual crimes and convicted offenders within their communities. The residents of this county want to know if there are registered offenders in their neighborhood.

(Doc. No. 55-4 ¶¶ 5–8.)

The plaintiffs, in connection with their Motion for Summary Judgment, asked the defendants to confirm whether they had any evidence, other than the statements of Grady and Kerley, to support various propositions regarding the Act. In response, the defendants conceded the following for purposes of the plaintiffs' motion:

- "Defendants have no evidence showing that the Act generally reduces the incidence of criminal offenses, other than statements of law enforcement, including the declarations of [Grady and Kerley]." (Doc. No. 128 ¶ 14.)

- "Defendants have no empirical evidence showing that the Act provides any other societal benefits, other than statements of law enforcement, including the declarations of [Grady and Kerley]." (*Id.* ¶ 15.)

16

- "Defendants have no evidence showing that the legislature considered any evidence in enacting any aspect of the Act." (*Id.* ¶ 16.)

- "Defendants have no evidence showing that failure to enforce the Act against Plaintiffs will increase the likelihood of Plaintiffs committing future criminal offenses, other than the declarations of [Grady and Kerley]." (*Id.* ¶ 17.)

- "Defendants have no justification for administering the Act other than its text." (*Id.* ¶ 19.)

The plaintiffs argue that the defendants' lack of evidence regarding salutary effects of the Act is further confirmation that it exists as a form of punishment.

The plaintiffs, for their part, have presented some evidence of their own regarding the Act's effects, although the effects they have focused on are, unsurprisingly, different. They have, for example, filed maps of Davidson County, Shelby County, and Knox County identifying "drug-free school zones," as a way to demonstrate the geographic prevalence of schools in those jurisdictions. (Doc. Nos. 124-1 to -3.) Earlier in the case, the individual plaintiffs filed Declarations outlining their own experiences with the Act, including hardships that they experienced in their lives due to their presence on the registry. (Doc. Nos. 35-1 to -8, 45-1.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting]

17

forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to his own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of his claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d 374 (citing *Anderson*, 477 U.S. at 252).

## II. ANALYSIS

### A. *Ex Post Facto* Application of the Act

#### 1. Governing Caselaw

The parties agree that the government may not "retroactively . . . increase the punishment for criminal acts." *Collins*, 497 U.S. at 43. It is also well-settled that this prohibition covers more than express changes to the particular statutory sentence associated with an offense. *See Peugh*, 569 U.S. at 539 (noting that the Supreme Court has "never accepted the proposition that a law must increase the maximum sentence for which a defendant is eligible in order to violate the *Ex Post Facto* Clause") (citing *Lindsey v. Washington*, 301 U.S. 397 (1937)). To the contrary, a

state's "[s]ubtle *ex post facto* violation[]" is "no more permissible than [an] overt one[]." *Collins*, 497 U.S. at 46. The parties disagree, however, with regard to whether or not the set of obligations, liabilities, and restrictions arising out of the Act qualifies as a punishment.

The Supreme Court has held that a state's operation of a sexual offender registry that includes offenders whose crimes took place prior to the registry's adoption does not, in and of itself, amount to an *Ex Post Facto* Clause violation, because a simple registry, without additional harms and restrictions, is not inherently a mechanism of punishment. Specifically, in *Smith v. Doe*, 538 U.S. 84 (2003), the Supreme Court considered the constitutionality of the retroactive application of an Alaska sexual offender law that consisted of "two components: a registration requirement and a notification system." *Id.* at 90. To determine whether the registry amounted to a retroactive punishment, the Court applied the standard it had established in *Kansas v. Hendricks*, 521 U.S. 346, 366 (1997), which had involved a challenge to a statute governing involuntary commitment of certain mentally ill sexual offenders:

> We must "ascertain whether the legislature meant the statute to establish 'civil' proceedings." If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is "so punitive either in purpose or effect as to negate [the State's] intention to deem it 'civil.'"

*Smith*, 538 U.S. at 92 (quoting *Hendricks*, 521 U.S. at 361). The Court added that, because a legislature is entitled to considerable deference when it states its purpose, "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (quoting *Hudson v. United States*, 522 U.S. 93, 100 (1997)). The Court concluded, based on the language of the Alaska statute, that the Alaska registry system was intended to be civil in nature, giving rise to a presumption that it was not punitive. *Id.* at 94–95.

19

The Court therefore turned to the question of whether the Alaska statute had a punitive purpose or effect. The Court concluded that its analysis should be guided by the factors related to the punitive character of a statute set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963):

> [1] Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned.

*Id.* at 168–69 (internal footnotes omitted). Particularly relevant, the Court wrote, were the questions of whether the challenged regulation "has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Smith*, 538 U.S. at 97.

Based on those factors, the Supreme Court concluded that the Alaska registration system was not punitive in character. Among the grounds for its conclusion was that the Alaska law "impose[d] no physical restraint." *Smith*, 538 U.S. at 100. The Court also noted that, unlike with criminal regimes such as probation, "offenders subject to the Alaska statute are free to move where they wish and to live and work as other citizens, with no supervision." *Id.* at 101. With regard to the lifelong duration of the reporting requirements for some offenders, the Court concluded it was not excessive, citing "[e]mpirical research" on recidivism among child molesters. *Id.* at 104.

A few years later, in *Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007), the Sixth Circuit considered the application of the *Ex Post Facto* Clause to the version of the Tennessee

registration regime in force at the time. As *Smith* requires, the court looked first to whether the Tennessee General Assembly had expressly designated the law as civil or whether it had declared some punitive intent. The Act, then as now, included provisions stating that the purpose of the Act is public safety, that the Act "shall not be construed as punitive," and that "the general assembly does not intend that the information be used to inflict retribution or additional punishment on those offenders." Tenn. Code Ann. § 40-39-201(6), (8). The court therefore turned to the second part of the *Smith* inquiry—whether the punitive purpose or effect of the Act was sufficient to overcome the stated legislative intention. *Doe*, 507 F.3d at 1004. Relying on the multi-factor *Mendoza-Martinez* test, the court concluded that the Act was not punitive. The court noted, in particular, that "registration, reporting, and surveillance components are not of a type that we have traditionally considered as a punishment" and that the Act does not "prevent [a registered offender] from changing jobs or residences or traveling to the extent otherwise permitted by their conditions of parole or probation."[8] *Id.* at 1005.

Meanwhile, the Tennessee General Assembly continued its pattern of expanding the requirements of the registration regime by amendment, particularly with regard to restrictions related to children, even for registrants whose only victims were adults. For example, restrictions about entering schools, playgrounds and other facilities were added in 2008. *See* 2008 Tenn. Pub. Acts, ch. 1164, § 11. Restrictions related to libraries were added in 2011. *See* 2011 Tenn. Pub. Acts, ch. 287. The Act's residence restrictions regarding schools and other facilities were

---

[8] The Act did, at the time, restrict where a registered offender could live or work, which had been discussed at length at the district court level. The district court, consistently with the law, concluded that, "[w]hile provisions of the Act restrict sexual offenders from establishing a residence or employment within a certain radius of schools or child care facilities, offenders do not need permission to move or change jobs and are free to live and work away from those restricted areas." *Doe v. Bredesen*, No. 3:04-CV-566, 2006 WL 849849, at *8 n.5 (E.D. Tenn. Mar. 28, 2006). The court construes the Sixth Circuit's opinion as making the same point, rather than suggesting that changing jobs or residences was not impeded to any extent.

extended to offenders whose victims were adults in 2014. *See* 2014 Tenn. Pub. Acts, ch. 992, §

1. The prohibition on being alone with children other than one's own in a "private area" were

added in 2015. *See* 2015 Tenn. Pub. Acts, ch. 516.

In 2016, the Sixth Circuit considered the issue of retroactive application of registration

laws anew in *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016). That case involved Michigan's

sexual offender registration system, which, the court wrote, "began in 1994 as a non-public

registry maintained solely for law enforcement use" but "ha[d] grown into a byzantine code

governing in minute detail the lives of the state's sex offenders." *Id.* at 697. The court recounted

a history of amendments strikingly similar, though not identical, to Tennessee's:

> Over the first decade or so of SORA's[9] existence, most of the changes centered
> on the role played by the registry itself. In 1999, for example, the legislature
> added the requirement that sex offenders register in person (either quarterly or
> annually, depending on the offense) and made the registry available online,
> providing the public with a list of all registered sex offenders' names, addresses,
> biometric data, and, since 2004, photographs. *See* Mich. Pub. Act 85 §§ 5a(4),
> 8(2), 10(2)(3) (1999); Mich. Pub. Acts 237, 238 (2004). Michigan began taking a
> more aggressive tack in 2006, however, when it amended SORA to prohibit
> registrants (with a few exceptions, *see* Mich. Comp. Laws § 28.734–36) from
> living, working, or "loitering" within 1,000 feet of a school. *See* Mich. Pub. Acts
> 121, 127 (2005). In 2011, the legislature added the requirement that registrants be
> divided into three tiers, which ostensibly correlate to current dangerousness, but
> which are based, not on individual assessments, but solely on the crime of
> conviction. *See* Mich. Pub. Acts 17, 18 (2011). The 2011 amendments also
> require all registrants to appear in person "immediately" to update information
> such as new vehicles or "internet identifiers" (e.g., a new email account). *See id.*
> The 2006 and 2011 amendments apply retroactively to all who were required to
> register under SORA. *See* Mich. Pub. Act 46 (2006); Mich. Pub. Acts 17, 18
> (2011). Violations carry heavy criminal penalties. *See* Mich. Comp. Laws §
> 28.729.

*Snyde*r, 834 F.3d at 697–98. Five plaintiffs challenged the law on various grounds, including the

*Ex Post Facto* Clause. The case went to a bench trial, which permitted the development of a

---

[9] "SORA" stands for "Sex Offender Registration Act," an acronym used for Michigan's Act and also used
generically to refer to many states' acts, including often Tennessee's—even though that is not actually the
present name of the Act.

significant factual record. The Sixth Circuit, based on that record, noted that the plaintiffs "had trouble finding a home in which they c[ould] legally live or a job where they c[ould] legally work," and "those Plaintiffs who ha[d] children (or grandchildren)" were prevented "from watching them participate in school plays or on school sports teams" or from "visiting public playgrounds with their children for fear of 'loitering.'" *Id.* at 698.

The Sixth Circuit performed the first step of the *Smith* analysis and found that the statute purported to be civil and non-punitive on its face. *Id.* at 700–01. The court then focused the second part of the *Smith* analysis on the five *Mendoza-Martinez* factors that *Smith* had identified as particularly salient in registry cases:

> (1) Does the law inflict what has been regarded in our history and traditions as punishment?
>
> (2) Does it impose an affirmative disability or restraint?
>
> (3) Does it promote the traditional aims of punishment?
>
> (4) Does it have a rational connection to a non-punitive purpose?
>
> (5) Is it excessive with respect to this purpose?

*Id.* at 701 (citing *Smith*, 538 U.S. at 97).

With regard to the first factor—history and tradition—the court noted that, although Michigan's act had "no direct ancestors in our history and traditions," it "resemble[d], in some respects at least, the ancient punishment of banishment" as well as "traditional shaming punishments." *Id.* at 701–02. The court cited evidence that vast swaths of the state's more populous areas were unavailable to the registrants for living or working, and the registrants were branded with derogatory classifications that did not reflect an individualized determination that the descriptor was justified. *Id.* The court also observed that life under the Michigan system,

unlike life under the Alaska system upheld in *Smith*, "resembles the punishment of parole/probation." *Id.* at 703.

The court also found that the second factor—affirmative disability and restraint—favored a finding of punitive effect, in light of the aforementioned restrictions on a registered offender's residence, work, and movement. The court observed that those restrictions amounted to "restraints . . . greater than those imposed by the Alaska statute [at issue in *Smith*] by an order of magnitude." *Id.* With regard to factor three—the traditional aims of punishment—the court concluded that the Michigan act

> advances all the traditional aims of punishment: incapacitation, retribution, and specific and general deterrence. Its very goal is incapacitation insofar as it seeks to keep sex offenders away from opportunities to reoffend. It is retributive in that it looks back at the offense (and nothing else) in imposing its restrictions, and it marks registrants as ones who cannot be fully admitted into the community. Further, . . . it does so in ways that relate only tenuously to legitimate, non-punitive purposes. Finally, its professed purpose is to deter recidivism . . . , and it doubtless serves the purpose of general deterrence.

*Id.* at 704.

The last two factors—rational relationship to purpose and excessiveness—are closely related because they both consider the degree to which a law serves its stated civil purpose, as opposed to, for example, a desire for retribution or stigmatization appropriate only in the criminal context. The Sixth Circuit found that, based on the evidence in the record, the connection between the registration regime and its stated public safety purposes was weak. The court noted a study "suggest[ing] that sex offenders (a category that includes a great diversity of criminals, not just pedophiles) are actually *less* likely to recidivate than other sorts of criminals." *Snyder*, 834 F.3d at 704 (citing Lawrence A. Greenfield, Recidivism of Sex Offenders Released from Prison in 1994 (2003)). "In fact," the court observed, "one statistical analysis in the record concluded that laws such as SORA actually *increase* the risk of recidivism, probably because

24

they exacerbate risk factors for recidivism by making it hard for registrants to get and keep a job, find housing, and reintegrate into their communities." *Id.* at 704–05 (citing J.J. Prescott & Jonah E. Rockoff, *Do Sex offender Registration and Notification Laws Affect Criminal Behavior?,* 54 J.L. & Econ. 161, 161 (2011)). Likewise, with regard to excessiveness, the court observed that the Michigan law imposed a number of laborious requirements on offenders for which the actual public safety benefits were, at best, speculative, concluding that the "punitive effects of these blanket restrictions thus far exceed even a generous assessment of their salutary effects." *Id.* at 705.

The court accordingly found that the Michigan law was punitive in effect and could not be imposed retroactively. *Id.* (collecting similar holdings from other courts). The court forcefully explained:

> A regulatory regime that severely restricts where people can live, work, and "loiter," that categorizes them into tiers ostensibly corresponding to present dangerousness without any individualized assessment thereof, and that requires time-consuming and cumbersome in-person reporting, all supported by—at best—scant evidence that such restrictions serve the professed purpose of keeping Michigan communities safe, is something altogether different from and more troubling than Alaska's first-generation registry law. SORA brands registrants as moral lepers solely on the basis of a prior conviction. It consigns them to years, if not a lifetime, of existence on the margins, not only of society, but often, as the record in this case makes painfully evident, from their own families, with whom, due to school zone restrictions, they may not even live. It directly regulates where registrants may go in their daily lives and compels them to interrupt those lives with great frequency in order to appear in person before law enforcement to report even minor changes to their information.

> We conclude that Michigan's SORA imposes punishment.

*Id.* at 705.

2. Application of *Snyder* to this Case

Although the Governor and Director maintain that *Snyder* was "wrongly decided," it is undisputed that *Snyder* is the law of this circuit and binding on this court. (Doc. No. 116 at 8.)

*Snyder*, moreover, was not simply a case setting forth the general *Ex Post Facto* Clause principles at issue here; *Snyder* involved precisely the kind of challenge these plaintiffs have raised, directed at a similar law that simply happened to be in another state. Broadly speaking, then, there are only three ways that *Snyder* could dictate any outcome other than a conclusion that the Act, like Michigan's SORA, is punitive for the purposes of the *Ex Post Facto* Clause analysis: first, the Act could differ from Michigan's law in some way sufficient to support a conclusion that Tennessee's scheme, unlike Michigan's, is non-punitive; second, *Tennessee itself* could differ from Michigan in some way that would render a law punitive in Michigan nevertheless non-punitive here; or, third, the evidence regarding registry laws relevant to the *Mendoza-Martinez* analysis could simply be so different here that *Snyder* is inapposite. The defendants, however, have not established any of those possibilities.

First, there is no meaningful way in which the Act is less like a traditional punishment than the Michigan law was. For example, although the Governor and Director list a number of ways in which, they argue, the Act's regime is less demanding than traditional parole, they have not explained why any of those differences distinguishes this case from *Snyder*, which explicitly did not require the conditions of inclusion on the registry to be identical to the conditions of parole in order for there to be a constitutionally persuasive resemblance. In *Snyder*, the Sixth Circuit acknowledged that Michigan's registry scheme was "not identical to any traditional punishments," but it did not end its inquiry there. *Snyde*r, 834 F.3d at 703. Rather, the court acknowledged that the *Mendoza-Martinez* factors do not look merely to whether a law exactly replicates a traditional punishment, but whether it "resembles" one. *Id.* at 701. With regard to parole, in particular, the Sixth Circuit wrote:

> In *Smith*, which involved nothing more than reporting requirements, the [Supreme] Court took seriously the claim that the Alaska statute resembled

26

parole/probation, acknowledging that "[t]his argument has some force, but," concluding that it was ultimately dissimilar because, unlike parolees, "offenders subject to the Alaska statute are free to move where they wish and to live and work as other citizens, with no supervision." 538 U.S. at 101. Under SORA, by contrast, registrants are subject to numerous restrictions on where they can live and work and, much like parolees, they must report in person, rather than by phone or mail. Failure to comply can be punished by imprisonment, not unlike a revocation of parole. *And while the level of individual supervision is less than typical of parole or probation, the basic mechanism and effects have a great deal in common.*

*Snyder*, 834 F.3d at 703 (emphasis added).

The same analysis applies with regard to *Snyder*'s conclusion that Michigan's "requirements also resemble[d] traditional shaming punishments." *Snyder*, 834 F.3d at 702. Tennessee's Act, like Michigan's, is not an exact replica of traditional public shaming, but it bears meaningful similarities, and all of the supposed rejoinders offered by the defendants to those similarities would have been just as true in *Snyder* as they are here. The Governor and Director argue that the Act is not comparable to shaming because the Act "does not promote face-to-face shaming." (Doc. No. 116 at 12.) This argument has no merit. Michigan's registration scheme did not expressly promote fact-to-face confrontations or humiliation any more than Tennessee's does. Nevertheless, the law did humiliate registrants and expose them to potential interpersonal confrontation, as the Act undoubtedly does in Tennessee.

*Snyder*'s comparison to the traditional punishment of exile also holds true in Tennessee. The geographic and demographic patterns of Michigan and Tennessee are, of course, not identical. The defendants, however, have not identified anything that might even *possibly* be so different between the states that it would dictate a different conclusion. The Sixth Circuit, in *Snyder*, used, as an example, an analysis of proximity to schools in Grand Rapids, Michigan—a

27

city that, according to recent census figures,[10] has a population of about 200,000.[11] The defendants have been unable to identify any reason why living with the same basic restrictions would be significantly easier in, for example, the markedly *more* populous cities of Nashville (pop. ~680,000[12]) or Memphis (pop. ~630,000[13]). Of course, there are places in Tennessee where less-dense development presumably makes compliance easier. Again, though, that is an argument that could have prevailed in *Snyder* but did not. Michigan, like Tennessee, is a diverse state with various different types of communities, and the *Snyder* court expressly acknowledged that the Michigan regime was likely more burdensome in "densely populated areas" than elsewhere. *Snyder*, 834 F.3d at 701. That did not dissuade the Sixth Circuit from looking at the effects of the Act in those densely populated areas and concluding that they supported a finding of punitive effect.

The defendants complain that the plaintiffs in *Snyder* provided a map prepared by an expert witness identifying precisely how much the challenged law restricted the movement and residence of registrants in at least one city, whereas these plaintiffs have supplied only a map of drug-free school zones, which, though relevant to understanding the prevalence of schools in the underlying counties, does not actually depict the boundaries imposed by the Act. But neither *Snyder*, nor the *Mendoza-Martinez* factors generally, requires an exact figure establishing the

---

[10] As the Governor and Commissioner note in their briefing (Doc. No. 66 at 16 n.3), "courts may take judicial notice of government statistics such as United States census data . . . ." *United States v. Neal*, 577 F. App'x 434, 452 (6th Cir. 2014) (citation omitted).

[11] *See* U.S. Census Bureau, QuickFacts: Grand Rapids city, Michigan, available at https://www.census.gov/quickfacts/fact/table/grandrapidscitymichigan#.

[12] *See* U.S. Census Bureau, QuickFacts: Nashville-Davidson metropolitan government (balance), Tennessee, available at https://www.census.gov/quickfacts/fact/table/nashvilledavidsonmetropolitangovernmentbalancetennessee/RTN131212.

[13] *See* U.S. Census Bureau, QuickFacts: Memphis city, Tennessee, available at https://www.census.gov/quickfacts/memphiscitytennessee.

28

amount of territory in which a registrant's presence, movement, residency, or work is restricted. The question here is merely whether the Act excludes registrants from so much of their communities that it is comparable to banishment; what matters is the general scale of the effect, not every detail. While an expert-created map would undoubtedly help with such an inquiry, it is not required. The court's duty is to look at the evidence that *is* available in this case and determine what outcome the law requires.

Ultimately, whether one knows every inch of the cartography or not, there is simply no serious or plausible basis for denying that, in Tennessee's denser cities, schools, parks, and daycares are geographically commonplace and difficult to avoid. The court, moreover, is permitted to acknowledge as much without requiring the plaintiffs to provide supplemental evidence to that effect. Rule 201 of the Federal Rules of Evidence permits a court, either by motion of a party or on its own motion, to "judicially notice a fact that is not subject to reasonable dispute because it" either "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." That includes taking judicial notice of indisputable facts about a region's basic geography. *See, e.g., Tucker v. Outwater*, 118 F.3d 930, 935 (2d Cir. 1997) ("[T]his court takes judicial notice of the fact that Jefferson County and Yates County do not adjoin and, in fact, are separated by over 100 miles and several large lakes."). Indeed, the Sixth Circuit has gone even farther than that, holding that a court can "take judicial notice of maps" from a reliable commercial source, such as "maps.google.com," at least for a purpose such as calculating the rough distance between points. *Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1008 (6th Cir. 2017). Taking judicial notice of the much less specific fact that

schools, parks, and other areas referenced by the Act are widely distributed throughout Tennessee's denser areas is well within the boundaries of what is permitted.

The plaintiffs' claims might have benefited from more detailed evidence; maps presented in support of similar claims in front of Judge Richardson of this court, for example, "clearly" showed "that a large portion of Davidson County is unavailable to Plaintiffs and other registered sex offenders." *Doe #1 v. Lee*, 518 F. Supp. 3d 1157, 1188 (M.D. Tenn. 2021). Although the plaintiffs argue that the court can take judicial notice of those maps, there is no need to stretch the court's Rule 201 powers to the point where the court is treating evidence in another case as evidence in this one. Even without the level of precision that a better map would provide, the court can conclude that the Act's geographic restrictions are severe enough to be comparable to banishment for the same reasons that applied to Michigan's scheme.

The only supposed rational purpose that the defendants can identify for such a policy is a poorly-defined interest in public safety. Yet the Governor and Commissioner also concede, at least for the purposes of summary judgment, that they do not actually have any evidence that the Act makes future crimes less likely—aside from two statements from law enforcement that are so bare-bones and speculative as to be nearly meaningless. At most, the defendants point to evidence establishing, unremarkably, that there is an ongoing risk that *someone* in Tennessee will commit sex crimes, which, the defendants argue, justifies restraining the plaintiffs and others with similar convictions since those individuals might go on to be the perpetrators. But that thin argument could just as readily support policies that would obviously constitute *ex post facto* punishments, such as retroactive increases in prison sentences. In order for the Act to qualify as a prophylactic, civil safety regime, there needs to be at least some tailoring of its restrictions to actual, demonstrable risks. Instead, the Act simply imposes its restrictions automatically on

every person convicted by a jury of committing a certain type of criminal offense—in other words, like a punishment.

The remaining *Mendoza-Martinez* factors, as interpreted by *Snyder*, similarly support the plaintiffs' challenge. The Sixth Circuit found that Michigan's restrictions on "where registrants may live, work, and 'loiter'" amounted to an affirmative restraint, *Snyder*, 834 F.3d at 703, and the same analysis applies to the Act, which also restricts where a registrant may live or work and simply replaces "loiter" with "[s]tand [or] sit idly." Tenn. Code Ann. § 40-39-211(d)(1)(B). The Sixth Circuit's conclusion that the Michigan scheme "advance[d] all the traditional aims of punishment: incapacitation, retribution, and specific and general deterrence" can simply be imported, effectively word-for-word, into an analysis of Tennessee's Act. *Snyder*, 834 F.3d at 704. Finally, the Sixth Circuit's conclusion regarding the excessiveness of Michigan's system was based on the fact that "the statute's efficacy [was] at best unclear," while "its negative effects are plain on the law's face." *Id.* at 705. The same is true of the Act; its efficacy is questionable, particularly with regard to some of its more overreaching restrictions, but the substantial negative effect on the registrant is undeniable.

What the plaintiffs have presented is a case that, in every meaningful way, falls squarely within the analysis of *Snyder*, with the exception that *Snyder* involved a somewhat more voluminous and detailed factual record. Under some standards, the more limited record in this case might prevent the court from resolving the case on summary judgment. The *Mendoza-Martinez* factors, however, look at the broad, general features of a law on its face. While some laws might nevertheless present a close enough call that the minute details nevertheless end up mattering a good deal, that is not the case here. *Snyder* overwhelmingly supports a holding that the Act is punitive for *Ex Post Facto* Clause purposes, even in the absence of a more

31

comprehensive factual record. The court, accordingly, will grant the plaintiffs summary judgment.

### 3. Count 1 vs. Count 2

The fact that the plaintiffs are entitled to summary judgment raises the question of which of their ostensibly separate claims summary judgment should encompass. Count 1 and Count 2 each alleges the violation of the same constitutional principle, resulting in the same injury. The two counts only differ from each other in that Count 1 supposedly involves something more akin to a "facial" challenge to the Act, while Count 2 involves an "as-applied" challenge.

The distinction between so-called "facial" and "as-applied" challenges has surfaced repeatedly in the litigation surrounding this issue, and it has rarely, if ever, been useful. "[T]he proper approach to a constitutional case typically turns on the applicable substantive constitutional doctrine and the institutional setting, not the classification of a case as a facial or as-applied challenge." Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235, 294 (1994). As this court wrote earlier in this particular litigation:

> Every challenge based on the retroactive application of a general criminal statute is, in some sense, an "as-applied" challenge, because it depends on the date of the challenger's underlying offense. The important question is not if variation between individuals matters—it always and inherently does in this area—but *what kind of* variation matters.

*Does #1-9 v. Lee*, 574 F. Supp. 3d 558, 561 n.4 (M.D. Tenn. 2021). That question, moreover, is entirely resolved by the substantive caselaw surrounding the punitive/nonpunitive distinction—not the judicially-created labels of "facial" and "as-applied." As a matter of binding Supreme Court precedent, the punitive nature of a statute does not depend on "the effect that [a challenged law] has on a single individual," but rather the punitive nature of the "statute on its face." *Seling v. Young*, 531 U.S. 250, 262 (2001) (quoting *Hudson v. United States*, 522 U.S. 93, 100 (1997)).

Judge Richardson of this court considered these issues at length in *Doe #11 v. Lee*, No. 3:22-CV-00338, 2022 WL 2181800 (M.D. Tenn. June 16, 2022), and similarly found the facial/as-applied distinction to be an "awkward fit" to claims like the plaintiffs'. *Id.* at *9. Rather, as Judge Richardson noted, all *Ex Post Facto* Clause claims based on the Act, regardless of how they are characterized, must be evaluated "based on the law's face, not based on its application to a specific plaintiff," other than with regard to "the date that the particular plaintiff . . . committed his offense." *Id.* at *11.

The distinction between succeeding under "Count 1" or "Count 2" of the Complaints is therefore substantively meaningless. The ostensibly separate counts describe a single cause of action: a claim under § 1983 for violation of the *Ex Post Facto* Clause, to be determined based on the substantive law governing such claims. The court, accordingly, will construe the Complaints to state a single claim on behalf of each relevant plaintiff and will grant summary judgment on those nine claims.

**B. Scope of Injunctive Relief**

### 1. Limitation of Relief to the Plaintiffs

In the plaintiffs' Motion for Summary Judgment, they set forth two possible types of injunctive relief that the court could grant. First, in a request that the plaintiffs associate with "Count 2" of their Complaints, they ask the court to

> permanently enjoin[] Defendants, their officers, agents, employees, servants, and attorneys, and all persons in active concert or participation with them (i) from enforcing the Act *against Plaintiffs*, including the continued publication of Plaintiffs' information on the sex offender registry, and (ii) to remove Plaintiffs' information from the sex offender registry.

(Doc. No. 121 at 1–2 (emphasis added).) "Alternatively," they seek relief, which they associate with "Count 1":

permanently enjoining Defendants, their officers, agents, employees, servants, and attorneys, and all persons in active concert or participation with them (i) *from applying the Act based on criminal offenses that occurred before the Act's effective date*, (ii) from enforcing the Act against Plaintiffs, including the continued publication of Plaintiffs' information on the sex offender registry, and (iii) to remove Plaintiffs' information from the sex offender registry.

(*Id.* at 2 (emphasis added).) In other words, the plaintiffs suggest that, if they prevail on what they have characterized as Count 1, the court should grant injunctive relief that would apply to every individual currently subject to the Act based on offenses that occurred prior to its effective date—despite the fact that the only actual plaintiffs remaining in this case, and the only individuals who have therefore demonstrated their entitlement to relief through the actual record of this case, are Does #1 through #9.

The court will not grant relief of that breadth, because it has no basis for doing so. If the plaintiffs had wished to file a putative class action suit, they should have. Then, the court would have had the opportunity to perform a "rigorous analysis" under Rule 23 of the Federal Rules of Civil Procedure to determine whether a classwide resolution would actually be appropriate. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). Rule 23 protects "the individual rights of litigants by imposing demanding standards on class certification." *In re Nat'l Prescription Opiate Litig.*, 976 F.3d 664, 671 (6th Cir. 2020). It is tailor-made to ferret out the kinds of hazards that might lurk beneath the surface when the rights of unnamed, but similarly situated, parties are raised in litigation. *See, e.g.,* Fed. R. Civ. P 23(a)(4) (forbidding certification unless "the representative parties will fairly and adequately protect the interests of the class"). These plaintiffs, however, stated no putative class claims and obtained no certification of a class. Rather, they are, in effect, seeking to bypass Rule 23 at the remedies stage, which they have no right under the Federal Rules of Civil Procedure to do.

34

The plaintiffs have briefed this matter based on the assumption that the scope of their relief should depend, not on whether they have followed the procedures necessary to vindicate the rights of others, but on where their claim falls on the facial/as-applied spectrum. "The label," though, "is not what matters," but rather "the plaintiffs' claim[s] and the relief that would follow." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). A federal court "has no jurisdiction to pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies." *United States v. Raines*, 362 U.S. 17, 21 (1960) (quoting *Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39 (1885)). This actual controversy is between the plaintiffs and the defendants. That does not, of course, mean that it would be categorically improper to grant the plaintiffs relief that might so happen to also benefit others. *See, e.g.*, *Bongo Prods., LLC v. Lawrence*, 548 F. Supp. 3d 666, 686 n.11 (M.D. Tenn. 2021) (Trauger, J.) (explaining why relief limited to the plaintiffs would be insufficient). In order for such relief to be available, however, the plaintiffs would have to demonstrate why such broader relief is actually appropriate to address the § 1983 injuries that they have established.

These plaintiffs, however, have not provided any evidence suggesting that granting relief to any other registrant is necessary to remedy the harms done to them. It may well be that the court's holding in this case strongly suggests that Tennessee's policy of continuing to apply the Act to other individuals who committed pre-enactment offenses is unconstitutional. Indeed, that is putting things too mildly; the court's holding *definitely* suggests as much. How could it not? But that has been true of many opinions that this court has written on this issue. In fact, it is difficult to imagine a policy that this court has been forced to find unconstitutional (or likely so) as many times as this one. None of that, though, changes the fact that it is the plaintiffs who

35

prevailed on § 1983 claims, the plaintiffs whose injuries have been established with a factual record, and the plaintiffs who are entitled to injunctive relief. The court accordingly will limit the injunctive relief that it grants to those individuals.

## 2. Elision

Determining whom the injunctive relief will protect, however, does not end the court's inquiry, because the parties disagree regarding the scope of the injunctive relief to which the plaintiffs are entitled. Specifically, the defendants argue that, if the court determines that the Act cannot be applied retroactively as a whole, the court "should elide the provisions that make the Act punitive." (Doc. No. 127 at 3.) The doctrine of elision, like the closely related concept of severability, "permits a court to elide an unconstitutional portion of a statute and find the remaining parts of the statute to be constitutional and effective." *Int'l Ass'n of Firefighters Loc. 3858 v. City of Germantown*, 98 F. Supp. 2d 939, 949 (W.D. Tenn. 2000) (citing *State v. Tester*, 879 S.W.2d 823, 830 (Tenn. 1994)). As the defendants correctly point out, Supreme Court caselaw permits, at the very least, the retroactive imposition of certain bare-bones registry requirements under *Smith*. The defendants suggest that the court should therefore simply pare back the Act to a safely non-punitive, abridged form applicable to the plaintiffs, rather than ordering that the plaintiffs be relieved of their obligations under the Act altogether.

"Whether a portion of a state's statute is severable is determined by the law of that state." *Byrd v. Tennessee Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 626 (6th Cir. 2018) (quoting *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 371 (6th Cir. 2006)). There is, however, a certain amount of tension in Tennessee's laws addressing elision and severability. On one hand, the chapter of the Tennessee Code setting forth general principles for the construction of statutes includes a "severability" provision seeming to favor the doctrine:

> It is hereby declared that the sections, clauses, sentences and parts of the Tennessee Code are severable, are not matters of mutual essential inducement, and any of them shall be exscinded if the code would otherwise be unconstitutional or ineffective. If any one (1) or more sections, clauses, sentences or parts shall for any reason be questioned in any court, and shall be adjudged unconstitutional or invalid, such judgment shall not affect, impair or invalidate the remaining provisions thereof, but shall be confined in its operation to the specific provision or provisions so held unconstitutional or invalid, and the inapplicability or invalidity of any section, clause, sentence or part in any one (1) or more instances shall not be taken to affect or prejudice in any way its applicability or validity in any other instance.

Tenn. Code Ann. § 1-3-110.[14] At the same time, however, there is a substantial body of caselaw clearly stating that "use of the doctrine [of elision] is *not* favored" by Tennessee courts. *Wells v. State*, No. E2015-01715-COA-R3-CV, 2016 WL 7009209, at *3 (Tenn. Ct. App. Dec. 1, 2016) (emphasis added) (collecting cases). Under that caselaw, even the presence of a directly applicable severability clause is not conclusive regarding whether elision is appropriate. *See Gibson Cnty. Special Sch. Dist. v. Palmer*, 691 S.W.2d 544, 551 (Tenn. 1985) ("It is important to note that the court refused to apply the doctrine of elision in *Arthur v. State*, *supra*, despite the existence of a severability clause in the legislation that was before the Court in that case.").

Ultimately, the vague question of whether elision and severability are "favored" should probably take a back seat to simply applying the actual substantive test for elision, as it has been set forth in Tennessee law. Pursuant to that test, elision is appropriate "when a conclusion can be reached that the legislature would have enacted the act in question with the unconstitutional

---

[14] The Public Law enacting a significant 2004 overhaul of the Act also included a general severability clause, providing that, "[i]f any provision of this act or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to that end the provisions of this act are declared to be severable." 2004 Tennessee Laws Pub. Ch. 921 (H.B. 3467). That clause, however, was not designated by the Act as for codification in the actual Tennessee Code, and the Tennessee Supreme Court has held that such a statute should be treated as "not contain[ing] a severability clause." *State v. Tester*, 879 S.W.2d 823, 830 & n.2 (Tenn. 1994). In any event, as the court discusses in this section, Tennessee's caselaw regarding severability clauses would render the clause non-determinative, even if the court treated it as in force.

portion omitted." *Willeford v. Klepper*, 597 S.W.3d 454, 471 (Tenn. 2020) (quoting In re Swanson, 2 S.W.3d 180, 189 (Tenn. 1999)). That test, though, raises a vexing question: What, exactly, is the "unconstitutional portion" of the Act that the defendants would have the court elide? There is no particular section, subsection, or clause of the Act that can be excised to create the supposedly constitutional *status quo* that the defendants envision. The court could, in a sense, "elide" the "portion" of the Act's definitions of "sexual offense" and "violent sexual offense" that reaches people whose offenses were committed pre-enactment—although even that would be more like rewriting the statute than eliding a portion of it—but that elision would simply take the plaintiffs out of the Act's jurisdiction altogether, which is what the *plaintiffs* are asking for. What the defendants are suggesting, rather, is not for the court to elide, or even rewrite, one or two provisions, but for the court to reach into the statute and invent an entirely new category of offender, never contemplated by the General Assembly, who is subject to some provisions of the Act but not others—even though the provisions themselves make no such distinction.

Even that characterization, though, understates the challenges of what the defendants are requesting, because what is at issue here is not simply the Act, but also the entire system of administration that has grown up around the Act. The Act, by its very structure, relies on a diffusion of responsibility between various individuals and agencies for its enforcement and administration. *See, e.g.*, Tenn. Code Ann. § 40-39-202 (defining local law enforcement agencies and the Tennessee Department of Correction as "designated law enforcement agencies" for administration of the Act). There is no evidence before the court that TBI or other sectors of Tennessee law enforcement are actually capable of implementing—or even authorized to implement—a judicially created, tiered system of registration based on the registrant's date of offense.

Keeping a person on the registry but treating him as otherwise removed from the Act's restrictions may *sound* simple enough, but that illusion of simplicity is difficult to maintain when one considers how many different law enforcement agencies—and even non-law enforcement entities such as schools and parks—are charged with enforcing the Act. If one of these defendants remained on the registry in the name of elision, would local police who found him on it know that he was a special type of registrant—one wholly unmentioned in any Tennessee statute or regulation—who is permitted to do things other registrants cannot? Would a school principal? Would a parks department? Indeed, this court's experience has been that Tennessee officials have demonstrated a marked inability to coordinate an effective response, even to the far simpler directive to honor an outright removal from the registry. *See Doe v. Lee*, No. 3:21-CV-00028, 2022 WL 1752184, at *2 (M.D. Tenn. May 31, 2022) (describing multiple officers' arriving at plaintiff's home to perform an unannounced "sex offender check" in violation of the court's injunction). A change in offender classifications under the Act of the type suggested by the defendants would pose a massive coordination challenge that would itself surely include judgment calls and tradeoffs that go far beyond this court's power to simply issue an injunction and hope for the best.

"The doctrine of elision is not [the] proper means 'to completely re-write or make-over a statute.'" *State v. Crank*, 468 S.W.3d 15, 29 (Tenn. 2015) (quoting *Shelby Cnty. Election Comm'n v. Turner*, 755 S.W.2d 774, 778 (Tenn. 1988); citing *Tester*, 879 S.W.2d at 830). That is the job of legislators. This court, frankly, has no idea how the Tennessee General Assembly would choose to solve the problem of its Act's being unconstitutional with regard to a subset of aging offenders based on the dates of their offenses. Legislators might embrace the policy that the defendants advocate, but they might not. "If a statute needs repair, [there is] a constitutionally

39

prescribed way to do it . . . called legislation." *Perry v. Merit Sys. Prot. Bd.*, 137 S. Ct. 1975, 1990 (2017) (Gorsuch, J., dissenting). Legislating, though, is for legislators, and, because the relief suggested by the defendants would amount to "indulging in *judicial* legislation," *Tester*, 879 S.W.2d at 830 (emphasis added), it would be improper for this court to take that approach. The court, accordingly, will grant the full permanent injunctive relief requested by the plaintiffs.

## C. Availability of Declaratory Relief

Finally, the parties disagree regarding whether the plaintiffs are entitled to declaratory relief in addition to an injunction. The court's decision to grant or deny declaratory relief is guided by the so-called "*Grand Trunk* factors":

(1) whether the declaratory action would settle the controversy;

(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations at issue;

(3) whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race for res judicata;

(4) whether the use of a declaratory judgment action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and

(5) whether there is an alternative remedy that is better or more effective.

*Grand Trunk v. W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (internal quotation omitted). The defendants argue that the second and fifth factors, in particular, counsel against providing a declaration of the plaintiffs' rights, because the injunctive relief that they have sought (and will receive) is an independently adequate remedy that will render any such declaration superfluous.

The plaintiffs respond that "declaratory relief would complement injunctive relief by stating in plain terms that no one may enforce the Act against Plaintiffs and Plaintiffs have no

40

obligation to comply with the Act." (Doc. No. 123 at 21.) In many § 1983 cases, that argument would likely be unpersuasive. The court's injunction will, after all, already clearly forbid the defendants from enforcing the Act against the plaintiffs. Those defendants, at least, should need no further declaration of rights to admonish them. As the court has noted, however, the effects and enforcement of the Act are not limited to the actions of the defendants. The diffusion of responsibilities under the Act makes the plaintiffs' desire for a declaration of rights to which they can point if needed wholly reasonable. The court accordingly will

grant declaratory relief.[15]

## V. CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment (Doc. No. 115) will be denied, and the plaintiffs' Motion for Summary Judgment (Doc. No. 121) will be granted. Doe #9's Renewed Motion for Preliminary Injunction (Doc. No. 102) will be denied as moot.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[15] The court acknowledges that the plaintiffs have also requested summary judgment as to attorney's fees. They have not, however, provided documentation sufficient to support any particular fee award. The court will, consistently with its usual practice, make no ruling regarding attorney's fees at this time, without prejudice to a separate motion seeking such fees in the future.

41